STATE OF NORTH CAROLINA v. JOSEPH EDWIN BROMFIELD

No. 234A91

(Filed 17 July 1992)

1. **Evidence and Witnesses § 1220 (NCI4th)— defendant not illegally seized—admissibility of statement to officers**

Defendant was not illegally seized or detained in violation of the Fourth Amendment to the U.S. Constitution so as to render inadmissible defendant's first statement to Spring Lake police officers where Raleigh officers advised defendant at a bus station that he was not under arrest and asked defendant if he would accompany them to be questioned about a murder; defendant agreed to do so; defendant was not handcuffed and

his freedom was not restrained; defendant was not intimidated or locked in an office while at the police station; defendant signed a form in which he acknowledged his right to decline to accompany Spring Lake officers and stated that he accompanied the officers to Spring Lake of his own free will; defendant sat unattended and unrestrained in the lobby of the Spring Lake police department; officers explained to defendant that he was there voluntarily, that there were no charges against him, and that he was free to go anywhere he wanted; defendant went unescorted to the snack bar and restrooms; defendant acknowledged that, based upon prior experiences, he could not be coerced into talking with law officers; and a reasonable person would thus have believed that he was free to leave at the time defendant made his first statement to the officers.

**Am Jur 2d, Constitutional Law § 586.**

**Admissibility of pretrial confession in criminal case. 23 L. Ed. 2d 1340.**

**What constitutes "custodial interrogation" within rule of Miranda v. Arizona requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.**

2. **Evidence and Witnesses § 1220 (NCI4th) — probable cause for arrest — admissibility of second statement to officers**

Assuming arguendo that defendant was arrested prior to giving his second statement to the police, the statement was not inadmissible as fruit of the poisonous tree where the evidence reveals that defendant's arrest was based upon probable cause and that defendant waived his rights to remain silent and to have a lawyer present during questioning. Officers had probable cause to arrest defendant as an accessory after the fact to murder based upon his admission in his first statement that he left Spring Lake in an automobile with the perpetrator (1) with knowledge that the perpetrator had murdered two victims, (2) with knowledge that the perpetrator was leaving town because "the heat was coming," and (3) with knowledge of the location of the murder weapons.

**Am Jur 2d, Criminal Law § 791.**

**3. Evidence and Witnesses § 1220 (NCI4th) — defendant not illegally seized — third statement admissible**

Where the trial court properly denied defendant's motion to suppress defendant's first two statements to the police because defendant was not illegally seized or detained in violation of the Fourth Amendment, defendant's Fourth Amendment challenge to the admission of his third statement as being the fruit of the poisonous tree is also without merit.

**Am Jur 2d, Criminal Law § 791.**

**4. Evidence and Witnesses § 1255 (NCI4th) — invocation of right to counsel — further questioning — initiation of communications by accused**

An accused in custody who requests counsel is not subject to further questioning until counsel has been made available to him unless the accused himself initiates further communications with the police.

**Am Jur 2d, Criminal Law § 796.**

**Accused's right to assistance of counsel at or prior to arraignment. 5 ALR3d 1269.**

**5. Evidence and Witnesses § 1255 (NCI4th) — invocation of right to counsel — third statement — conversation initiated by defendant**

Defendant's third statement to the police after counsel had been appointed to represent him was the result of a conversation initiated by defendant and was not taken in violation of defendant's Sixth Amendment right to counsel where the police chief did not know that counsel had been appointed for defendant when he went to serve first degree murder warrants on defendant; defendant was shocked when informed about the warrants and voluntarily indicated to the police chief that he wanted to talk with him further about the facts of the case; and defendant made the third statement of his own free will in an effort to exculpate himself.

**Am Jur 2d, Criminal Law §§ 796-797.**

6. **Homicide § 268 (NCI4th)— murders in perpetration of robberies—acting in concert—sufficient evidence of robbery of both victims**

The evidence was sufficient for the jury to find that both victims were robbed so as to support defendant's conviction of first degree murder of both victims committed in the perpetration of armed robbery under the theory that he acted in concert with the actual perpetrator where it tended to show that the perpetrator, accompanied by defendant, went to the home shared by the two female victims, brandishing a knife and an axe handle; upon entering the house, the perpetrator struck both victims with the axe handle, and both women fell to the floor; the perpetrator then shot the first victim; when the second victim regained consciousness, she begged the perpetrator not to kill her, saying that she would tell him where drugs were if he would not kill her; the perpetrator then started stabbing the second victim with the knife; after murdering both women, the perpetrator took $400 and ten "rocks" of cocaine from the floor while defendant observed; defendant's own statements showed that the perpetrator was upset with both women about drugs and had told him that he was going to "get those bitches"; and both victims had plastic bags with a white substance in them in their clothing when they were killed.

**Am Jur 2d, Homicide §§ 34-40.**

7. **Criminal Law § 873 (NCI4th)— jury's request for written instructions—denial—oral instructions—exercise of discretion**

The trial court did not fail to exercise its discretion when it denied the jury's request for a written copy of instructions on the elements of armed robbery and instead reinstructed the jury orally where the court's response to the request indicates that, because the instructions did not exist in writing at the time the request was made, the court decided that reinstructing the jury orally would serve the same purpose as written instructions and would be more efficient given the time constraints.

**Am Jur 2d, Trial § 1149.**

8. **Criminal Law § 793 (NCI4th)— reinstruction—acting in concert—mere presence**

The substance of defendant's request that the trial court reinstruct on "mere presence" if it reinstructed on "acting in concert" was satisfied by the trial court.

**Am Jur 2d, Homicide §§ 561, 562.**

9. **Criminal Law § 750 (NCI4th)— final mandate—omission of instruction on reasonable doubt—error cured by reinstruction**

Any error in the trial court's omission of an instruction on reasonable doubt in the final mandate to the jury regarding armed robbery was cured by the trial court's correction of this omission when court resumed the next morning.

**Am Jur 2d, Homicide §§ 561, 562.**

10. **Criminal Law § 754 (NCI4th)— question by jury—consideration of each count separately—sufficiency of instruction**

The trial judge did not err in his response to a question by the jury as to whether finding defendant guilty of robbery with a dangerous weapon would mean that defendant was automatically guilty of felony murder where the court first instructed the jury that it should consider each "case" separately and then clarified this instruction by stating that he meant count when he said "case," that each case contains two counts, and that the jury should consider each count in each case separately.

**Am Jur 2d, Homicide § 561.**

Justice LAKE did not participate in the consideration or decision of this case.

APPEAL as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing sentences of life imprisonment entered by *Herring, J.*, at the 13 August 1990 Criminal Session of Superior Court, CUMBERLAND County, upon verdicts finding defendant guilty of first-degree murder. Heard in the Supreme Court 10 December 1991.

*Lacy H. Thornburg, Attorney General, by Mary Jill Ledford, Assistant Attorney General, for the State.*

*James R. Parish for defendant-appellant.*

STATE v. BROMFIELD

[332 N.C. 24 (1992)]

FRYE, Justice.

On 12 February 1990, defendant, Joseph Edwin Bromfield, was indicted for the murders and robberies of Annanitra "Star" Jackson and Arlena Elizabeth Redd. Defendant entered pleas of not guilty to the charges and was tried capitally on the theory of acting in concert with Everett "Witt" Monroe.[1]

The jury returned verdicts finding defendant guilty of the first-degree murders of both victims under the felony murder rule and guilty of two counts of robbery with a dangerous weapon. Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended sentences of life imprisonment for each murder conviction. Finding that the robbery conviction as to each victim merged with the murder convictions, the trial judge arrested judgment on both convictions of robbery with a dangerous weapon and, in accordance with the jury's recommendation, imposed a sentence of life imprisonment for each murder conviction. Defendant gave notice of appeal to this Court on 28 August 1990. Defendant brings forward several assignments of error. After thorough review of the record, we conclude that defendant received a fair trial, free of prejudicial error.

I.

The State's evidence tended to show the following sequence of events. In the late evening hours of 15 May 1989, Lorida Miller, Donald "Ducky" Sanderlin, and some of their friends arrived at the residence located at 109 Kaye Street in Spring Lake, North Carolina. Lorida Miller was seeking to get paid by her friend, Star Jackson, for having helped Star move that day. Ms. Miller and Mr. Sanderlin approached the house, noticing that it was dark. They opened the screen door, pushed the front door open, and stopped. In the living room lying near the door was Arlena Redd. She appeared to be dead. Star Jackson was lying in the middle of the living room. She too appeared to be dead. Ms. Redd had been beaten and stabbed several times, and Ms. Jackson had been beaten and shot.

Robert L. Thompson, a forensic pathologist in the office of the Chief Medical Examiner in Chapel Hill, North Carolina, per-

---

1. The record shows that shortly after his capture, Monroe was charged with two counts of first-degree murder.

formed an autopsy on the body of Arlena Redd. He testified that, in his opinion, the cause of Arlena Redd's death was blunt force injuries of the head and multiple stab wounds to the chest and back. John D. Butts, a pathologist and Chief Medical Examiner for the State of North Carolina, performed an autopsy on the body of Star Jackson. He testified that, in his opinion, the cause of Star Jackson's death was the gunshot wound to the back of the head and blunt force injuries. The autopsies revealed that both victims had plastic bags containing a white substance in their clothing.

After discovering the bodies, Ms. Miller found Ms. Redd's two little girls in a room in the back of the house. They were uninjured. Ms. Miller put them in her car and tried to console them. The children told Ms. Miller that a man named Witt was responsible for the murders. On the night in question, one of the girls had heard Witt's voice as he closed the door to their bedroom. At one time they had lived with Everett "Witt" Monroe and a woman associated with him. Witt now lived at a place called Moore's Motel. After talking to detectives, the girls were placed in Ms. Miller's custody.

Based upon the information provided by the girls, Spring Lake Police Chief Gil Campbell went to Moore's Motel, where Monroe lived with defendant, Joseph Bromfield. There, witnesses informed Chief Campbell that, shortly before he arrived, Monroe, who is black, along with a black female and two children, another black man named Michael Breaux, and a white man named Joseph Bromfield, had left in Mr. Breaux's automobile. They were headed in a northerly direction on Highway 87. Chief Campbell placed an all-points bulletin for Monroe, Breaux, and defendant, specifically in the area of Raleigh, in and around the bus stations and airports.

On 16 May 1989, Raleigh police officers and agents of the State Bureau of Investigation, who were working drug interdiction at the bus station, observed a group of people matching the descriptions of the people being sought by the Spring Lake Police Department. The group had its luggage on a cart outside the bus terminal near a bay where a bus traveling north was expected to arrive. The officers observed name tags on the luggage for a Mr. Rodriguez and a Mr. Bromfield. Recognizing the name "Bromfield," the officers approached the white male, introduced themselves and asked for

## STATE v. BROMFIELD

[332 N.C. 24 (1992)]

identification. Defendant correctly identified himself and produced identification. The group was then transported to the Raleigh Police Department, where they waited one and one-half hours until the Spring Lake officers arrived to transport them to Spring Lake.

While at the Spring Lake Police Department, defendant signed a statement on a form entitled "VOLUNTARY STATEMENT NOT UNDER ARREST." In this first statement,[2] taken after Miranda warnings were given, defendant stated that he was home when Monroe returned, hysterical and sweating. Monroe said that "he done those two dikes [sic] in" because they had "f---- [him] over with some drugs . . . [and] had messed up a package worth two thousand dollars of rock." Monroe said that "he couldn't account for the package with the main man, Jamaican Steve" and that Jamaican Steve no longer trusted him because the women had "f---- over him" and he had been "cut . . . out of the thing." Monroe said that they all needed to leave because "the heat was coming." Defendant said that he was planning to visit his mother in New Hampshire anyway, so he decided to accompany Monroe. Chief Campbell reviewed the statement and told defendant he found it unbelievable. In an apparent effort to boost his credibility, defendant told Campbell that he knew where the murder weapons had been discarded and could be found. Defendant left the police station with Sergeant Thomas to attempt to locate the weapons. The weapons were not found that night.

Several hours later, defendant signed a second statement on a form entitled "VOLUNTARY STATEMENT UNDER ARREST." In this statement defendant admitted that he had accompanied Monroe to the house where the victims lived and had witnessed Monroe kill the two women. Prior to going to the victims' house, Monroe had said that he was angry at the women for refusing to sell him drugs. Vowing to "get those bitches," Monroe grabbed defendant's axe handle and his own ten-inch blade knife. After committing the murders, Monroe took about $400 and "ten rocks" of cocaine from the floor. Upon the conclusion of this statement, defendant was transported to the Law Enforcement Center in

---

2. Defendant gave three statements to the police. The first statement is dated 16 May 1989 and was signed by defendant at 7:20 p.m. The second statement is dated 17 May 1989 and was signed by defendant at 12:30 a.m. The third and final statement was via a tape-recorded interview and was given at 4:30 p.m. on 17 May 1989.

Fayetteville and placed in jail under a $200,000 bond on two counts of accessory after the fact to murder.[3]

The next morning, 17 May 1989, defendant made his first appearance before the district court, was advised of his right to counsel, and requested court-appointed counsel. Following the appointment of counsel, defendant was returned to the Law Enforcement Center. That same morning, the Spring Lake police conducted a search in the area where defendant had indicated Monroe had thrown away the weapons. In the daylight hours, police were able to find a wooden axe handle, a .32 calibre pistol, and a knife. Chief Campbell then secured warrants charging defendant with the first-degree murders of Star Jackson and Arlena Redd. Later in the afternoon, Chief Campbell arrived at the Center with the two warrants. He escorted defendant to an interrogation room which he had reserved earlier, admittedly with hopes of getting a third statement from defendant. Chief Campbell then served the warrants upon defendant, who became upset at the new charges and indicated that he would like to make another statement.

In his third statement, given in the form of a tape-recorded interview, defendant stated that, prior to going to the victims' house, Monroe told him that he was going to take the cocaine from the women. Defendant said that the axe handle that Monroe took to the house belonged to defendant. Defendant admitted that he may have kicked one of the women when Monroe was beating them, and that after Monroe had killed the women, defendant picked up a couple of dollars from the floor. Defendant continued denying aiding and abetting the murders, saying he never expected the murders to occur. Defendant was then returned to the jail and held without bond.

Defendant did not testify at trial. He presented evidence solely for the purpose of showing his good character. Several witnesses testified that defendant was a mild-mannered, compassionate, and peaceful person, who was hardworking and trustworthy.

Other evidence will be discussed as it becomes relevant to a fuller understanding of the specific issues raised on appeal.

---

3. There is a conflict in the evidence as to exactly when defendant was arrested as an accessory after the fact to murder. This conflict is discussed in more detail under defendant's first assignment of error.

## II.

[1] In his first assignment of error, defendant contends that the trial court erred in denying his motion to suppress the statements made by him to law enforcement officers. Defendant contends that the statements were causally connected to his seizure and arrest, which he contends were without probable cause, and therefore violated his rights under the Fourth Amendment to the United States Constitution and Article I, Sections 19, 20 and 23 of the North Carolina Constitution. The State contends that defendant consented to all encounters and interaction which occurred between him and law enforcement officers until the time of his arrest for accessory after the fact to murder. Therefore, defendant was not "seized" within the meaning of the Fourth Amendment's prohibition against unreasonable searches and seizures at the time he made the first two statements. Accordingly, the State argues, the trial court did not err in denying defendant's first motion to suppress.[4]

"Only when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 20 L. Ed. 2d 889, 905 n.16 (1968). In assessing whether someone has been seized for purposes of the Fourth Amendment, the salient question is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *U.S. v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509 (1980); *State v. Johnson*, 317 N.C. 343, 360, 346 S.E.2d 596, 606 (1986). Defendant argues that, under the circumstances of the instant case, a reasonable person would not have believed he was free to leave. What the circumstances are is a question of fact to be decided by the trial court. How these circumstances would be viewed by a reasonable person is a question of law fully reviewable by an appellate court. With reference to the circumstances of the instant case, the trial judge, after considering the evidence presented at the first suppression

---

4. Defendant filed two motions to suppress statements. In the first motion, filed on 4 October 1989, defendant sought to suppress his statements, arguing that they were the result of a violation of the Fourth Amendment. In his second motion, filed 27 April 1990, defendant sought to suppress his third statement on the ground that it had been taken in violation of his Sixth Amendment right to counsel. It is the first motion that is at issue here. The second motion is addressed in defendant's second argument.

**STATE v. BROMFIELD**

[332 N.C. 24 (1992)]

hearing, made the following relevant findings of fact (rephrased and renumbered for convenience):

(1) At the bus station in Raleigh, Agent Black told defendant and his companions that the Spring Lake Police Department was interested in talking with them about a homicide in Spring Lake, and that they were not under arrest and asked if they would go to the Raleigh Police Department to wait until the Spring Lake officers arrived;

(2) Defendant and the others agreed to voluntarily go to the Raleigh Police Department with the officers;

(3) Agent Black advised the Raleigh police officers who arrived to transport the persons to the Raleigh Police Department that the individuals were not under arrest;

(4) Upon arrival at the Raleigh Police Department, Detective Thomas from Spring Lake spoke with each person separately and each was asked to return to Spring Lake voluntarily; rights were explained to each person and defendant read the rights and indicated that he understood them; defendant was asked by the officers if he would voluntarily return to the Spring Lake Police Department and defendant agreed that he would do so and signed a document[5] which indicates that he volunteered to go back with the officers to Spring Lake, that he realized he was not under arrest, that he did not have to go back with the officers except of his own free will, that he had not been threatened or promised anything, and that he was doing this so the police could question him concerning the crimes of homicide that occurred on 15 May 1989;

(5) Defendant was under no restraints other than the seatbelt upon the return trip to Spring Lake;

---

5. The document reads as follows:

> I, Joseph Edwin Bromfield, hereby volunteer to come back with Detective William R. Thomas and Officer Thomas Court to the Spring Lake Police Department. I realize that I am not under arrest and that I do not have to come back with these officers except of my own free will.
>
> I have not been threatened or promised anything. I do this so the police may question me concerning the crime of homicide that occurred the 15th day of May, 1989. No further statement.

The document was signed by defendant at 1:30 p.m. on 16 May 1989.

(6) Defendant's decision to talk with Spring Lake Detective Penny Goodwin and to make a statement and answer questions was made after having been advised of his rights; he indicated that he understood his rights, that he did wish to answer questions, and he did not wish to have a lawyer present during the questioning; the statement made by defendant was voluntary;

(7) Defendant's first statement was made and reduced to writing at 7:20 p.m. on 16 May 1989;

(8) Chief Campbell talked with defendant about the statement and told him he thought the statement was inaccurate; he again advised defendant of his rights; at this point defendant had not been charged and would have been free to leave the police station and Chief Campbell explained this to defendant;

(9) Defendant indicated to Chief Campbell that he would make a truthful statement;

(10) Defendant asked for something to drink and to go to the restroom and was allowed to do so. He went to the snack bar and restroom in another part of the building unescorted;

(11) Defendant then made a second statement, which was reduced to writing;

(12) Defendant was then arrested for accessory after the fact to murder and was transported to the Law Enforcement Center in Fayetteville;

(13) Defendant was familiar with arrest procedures in North Carolina; he had previously been arrested for felonies on three occasions and had been given Miranda warnings on those occasions; he knew he had a right to an attorney and did not have to make any statement;

(14) Defendant's statements were made in order to help himself.

Based on these and other findings, the trial court concluded, *inter alia*, that "none of the constitutional rights either federal or state of the Defendant were violated by his arrest, detention, interrogation, or either of the statements . . . ." The court concluded further that defendant's first and second statements "were made freely, voluntarily and understandingly" and that defendant was

aware of his rights and had "freely, knowingly, intelligently, and voluntarily waived each of those rights" before giving the statements.

We agree with the State that there was ample evidence in the record to support the trial court's findings of fact and that the findings support the conclusions of law. A trial court's findings of fact are binding on appeal when supported by competent evidence. *State v. Ross*, 329 N.C. 108, 123, 405 S.E.2d 158, 166 (1991). Inconsistencies or conflicts in the testimony do not necessarily undermine the trial court's findings, since such contradictions in the evidence are for the finder of fact to resolve. *State v. Jenkins*, 311 N.C. 194, 203, 317 S.E.2d 345, 350 (1984).

In *State v. Johnson*, 317 N.C. 343, 346 S.E.2d 596 (1986), this Court addressed a similar situation involving the circumstances surrounding an alleged seizure of the defendant and the admissibility of his confession. In *Johnson*, this Court rejected the defendant's argument that his confession was improperly admitted into evidence as having been made pursuant to an illegal seizure by law enforcement officers without probable cause. Acting on information which they had received, officers approached the defendant on a public road and requested that he accompany them to the police station so that they might question him about a homicide about which they thought he might have information. The defendant agreed to accompany them, and upon arrival at the station the officers read the defendant his rights, even though at that time he was considered merely a witness. Defendant signed a written waiver of his rights. He was questioned for more than three hours, was again read his rights, and once again waived them. In the afternoon, an officer introduced the defendant to a detective who said he "just wanted to meet a cold-blooded killer." *Johnson*, 317 N.C. at 350, 346 S.E.2d at 600. The defendant began to cry and then made a full confession, including statements that he had killed the victim.

At the suppression hearing, Johnson testified that he did not think he had any choice about accompanying the officers. He thought that he had been placed under arrest when he was approached by the officers, one of whom had a gun. Johnson testified that he thought that if he refused to accompany the officers he may have risked being shot. Nevertheless, he got into the car of his own free will. Johnson testified that there was no force involved.

**STATE v. BROMFIELD**

[332 N.C. 24 (1992)]

In concluding that the defendant had not been seized, the Court in *Johnson* found that the evidence which supported the trial court's findings of fact was that the defendant testified that he was not frisked or searched; that he was provided with cigarettes and coffee; that he was allowed to go unescorted to the bathroom and to make telephone calls; that he was left alone unsupervised in the interview room; that the detectives never raised their voices or talked in a loud, threatening manner and never called him a liar; and that the defendant acknowledged that based upon prior experiences, he understood his rights. *Id.* at 366, 346 S.E.2d at 608-09.

The evidence in the instant case, like that in *Johnson*, supports the trial court's findings of fact and ultimate conclusion that defendant was neither seized nor involuntarily detained at the time of the first statement. In fact, the evidence, including the form signed by defendant on 16 May 1989, demonstrates the consensual nature of defendant's interaction with the police officers. At the suppression hearing, Agent Black testified that he and another officer advised defendant at the bus station that he was not under arrest and asked if he would accompany them to be questioned. Defendant agreed to do so. He was at no time prior to his arrest handcuffed, nor was his freedom restrained. Other evidence showed that while at the police station, defendant was not intimidated or locked in an office. Defendant signed a form in which he acknowledged his right to decline to accompany the Spring Lake officers, but stated that he did so of his own free will. While at the Spring Lake police station, defendant sat in the lobby unattended and unrestrained. It was explained to defendant that he was there voluntarily, that there were no charges against him, and that he was free to go anywhere he wanted. Defendant went unescorted to the snack bar and restrooms, and acknowledged that based upon prior experiences, he could not be coerced into talking with law enforcement officers. Given these circumstances, we cannot say that a reasonable person would have believed he was not free to leave.

[2] There is a conflict in the evidence as to exactly when defendant was arrested. Defendant argues that the timing of his arrest is significant. Defendant argues that he was arrested for accessory after the fact to murder after giving the first "exculpatory" statement and prior to giving the second statement. Defendant contends that, at the time of his arrest, there was no probable cause, and any statement relating to or subsequent to that arrest is therefore

inadmissible as "fruit of the poisonous tree." Defendant argues that the trial court's finding that defendant was arrested after, rather than before, giving the second statement is not supported by the evidence. Chief Campbell testified initially that defendant was arrested after giving the second statement. Campbell later testified that defendant was apparently arrested prior to giving the second statement, pointing to the form upon which the second statement was taken, which was entitled "VOLUNTARY STATEMENT UNDER ARREST."

Assuming, *arguendo*, that defendant was arrested prior to giving his second statement, we hold that the second statement was nevertheless admissible. Contrary to defendant's argument, the evidence reveals that defendant's arrest was based upon probable cause and that defendant waived his rights to remain silent and to have a lawyer present during questioning. In his first statement, defendant stated that after Monroe killed the victims, he returned home hysterical, saying that they needed to leave town because "the heat was coming." Defendant admitted to his decision to accompany Monroe out of town. Also, at the conclusion of his first statement, defendant informed police officers that he knew the location of the murder weapons. Although a brief search failed to locate the weapons that night, defendant was nevertheless arrested as an accessory after the fact to murder. Defendant's admission that he left Spring Lake in the automobile with Monroe (1) with knowledge that Monroe had murdered the two victims, (2) with knowledge that Monroe was leaving town because "the heat was coming," and (3) with apparent knowledge of the location of the murder weapons, amounts to sufficient probable cause for his arrest as an accessory after the fact to murder. *See generally State v. Wrenn*, 316 N.C. 141, 147, 340 S.E.2d 443, 447 (1986) ("Probable cause exists when there is 'a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious [person] in believing the accused to be guilty.' ") (Citations omitted.)

Moreover, the trial court found as a fact, and there is substantial, uncontroverted evidence in the record which indicates that defendant was read his *Miranda* rights on several occasions. On each of these occasions, defendant waived his rights. Defendant does not challenge the trial court's conclusion that he fully understood his constitutional rights, including his right to remain silent. Because defendant knowingly, voluntarily, and intelligently waived his rights

STATE v. BROMFIELD

[332 N.C. 24 (1992)]

prior to giving his second statement, that statement is admissible even if, contrary to the trial court's finding, defendant was under arrest at the time of the statement. *See generally State v. Massey,* 316 N.C. 558, 342 S.E.2d 811 (1986) (confession properly admitted where defendant was fully advised of his *Miranda* rights and his waiver of those rights was knowing, voluntary, and intelligent).

[3] Based upon the foregoing, we hold that, because defendant was not illegally seized or detained in violation of the Fourth Amendment of the United States Constitution, the trial court did not err in denying defendant's motion to suppress the first two statements. Because the first two statements were not taken in violation of defendant's constitutional rights, defendant's Fourth Amendment challenge to the admission of his third statement as being fruit of the poisonous tree is also without merit. For the same reasons, we conclude that defendant's rights under Article I, Sections 19, 20 and 23 of the North Carolina Constitution were not violated.

In his next assignment of error, defendant argues that his third statement should have been suppressed because it was taken in violation of his Sixth Amendment right to counsel. It is uncontested that defendant's Sixth Amendment right to counsel had attached at the time the third statement was given. A person is entitled to counsel once judicial proceedings have been commenced against him, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Brewer v. Williams,* 430 U.S. 387, 398, 51 L. Ed. 2d 424, 436 (1977); *see also State v. Tucker,* 331 N.C. 12, 33, 414 S.E.2d 548, 560 (1992); *State v. Nations,* 319 N.C. 318, 324, 354 S.E.2d 510, 513 (1987). Here, defendant's right to counsel attached at his first appearance, when counsel was appointed. *McNeil v. Wisconsin,* --- U.S. ---, ---, 115 L. Ed. 2d 158, 168 (1991); *Tucker,* 331 N.C. at 33, 414 S.E.2d at 560; *Nations,* 319 N.C. at 324, 354 S.E.2d at 514.

[4] It is well settled that once an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing merely that he responded willingly to further police-initiated custodial interrogation, even if he has been again advised of his rights. *Edwards v. Arizona,* 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386 (1981). Therefore, an accused in custody who requests counsel is not subject to further questioning until counsel has been made available

to him, unless the accused himself initiates further communications with the police. *Edwards*, 451 U.S. at 485-86, 68 L. Ed. 2d at 386. In *Michigan v. Jackson*, 475 U.S. 625, 89 L. Ed. 2d 631 (1986), the United States Supreme Court held that this rule in *Edwards*, although decided under the Fifth Amendment, applies with at least equal force to situations involving the Sixth Amendment. *Id.* at 632-35, 89 L. Ed. 2d at 639-41. Under *Jackson*, if police initiate an interrogation after a defendant's assertion of his right to counsel at a judicial proceeding, any waiver of the right for that police-initiated interrogation is invalid. 475 U.S. at 636, 89 L. Ed. 2d at 642; *McNeil v. Wisconsin*, --- U.S. at ---, 115 L. Ed. 2d at 166.

[5]  At the suppression hearing regarding the third statement, the trial court found the following relevant fact:

> 7. That in this case Chief Gil Campbell was desirous of and was prepared to take the statement of the Defendant, not knowing that he had requested counsel, and that counsel had been appointed to represent him. That Chief Campbell indicated to the Defendant that he was there to arrest him for first degree murder, the Defendant indicated voluntarily to Chief Campbell that he wished to talk with him further about the facts of the matter, and that he thereby initiated further conversation with the officer. That Chief Campbell properly advised him again of his Miranda rights which the Defendant signed and indicated that he understood.

Based upon this and other findings, the trial court concluded that none of defendant's constitutional rights had been violated and that "defendant initiated the statements made to Chief Campbell even though an attorney had been appointed to represent him on that same date." Accordingly, the trial court concluded that the third statement was admissible. Because there is competent evidence in the record to support the trial court's finding that defendant initiated the conversation with Chief Campbell, we reject defendant's assignment of error.

Chief Campbell testified that, upon signing defendant out of jail, he indicated to defendant that he had come to serve first-degree murder warrants on him. When Chief Campbell informed defendant of the warrants, defendant was shocked and indicated to Chief Campbell that he wished to talk with him about the situation. Further testimony disclosed that defendant was calm when he made the statement and that defendant talked to the officers

of his own free will and made the statement in an effort to exculpate himself. This evidence supports the trial court's findings that defendant initiated the discussion with Chief Campbell. We are therefore bound by this finding. *State v. Ross*, 329 N.C. 108, 123, 405 S.E.2d 158, 166. We hold, therefore, that the trial court did not err in denying defendant's motion to suppress the third statement based upon a violation of defendant's Sixth Amendment right to counsel.

[6] In his next assignment of error, defendant contends that the trial court erred in denying his motion to dismiss at the close of all the evidence the charge of robbery with a dangerous weapon of Arlena Redd. Defendant further contends that, because the evidence was insufficient to support a charge of robbery with a dangerous weapon, the trial court erred in failing to dismiss the charge of first-degree murder based upon murder in the perpetration of an armed robbery. As the basis for his argument, defendant contends that there was no evidence that any personal property taken belonged to Ms. Redd. Defendant argues that the evidence showed that Star Jackson, rather than Arlena Redd, was in possession of the cocaine and money. The State responds that the evidence was sufficient to show that each victim was robbed. We agree with the State and find defendant's contentions to be without merit.

In ruling on a motion to dismiss, the trial court must determine whether there is substantial evidence of each essential element of the offense charged. *State v. Vines*, 317 N.C. 242, 253, 345 S.E.2d 169, 175 (1986). The evidence is to be considered in the light most favorable to the State, and the State is to be given the benefit of every reasonable inference to be drawn therefrom. *State v. Robbins*, 309 N.C. 771, 775, 309 S.E.2d 188, 190 (1983). The defendant's motion to dismiss must be denied if the State has offered substantial evidence against defendant of each essential element of the crime charged. *State v. Porter*, 303 N.C. 680, 685, 281 S.E.2d 377, 381 (1981). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980).

Under N.C.G.S. § 14-87, an armed robbery occurs when a person takes or attempts to take personal property from the person of another, or in his presence, or from any place of business or residence where there is a person or persons in attendance, by the use or threatened use of a dangerous weapon, whereby the

STATE v. BROMFIELD

[332 N.C. 24 (1992)]

life of a person is endangered or threatened. *State v. Porter*, 303 N.C. at 686, 281 S.E.2d at 382. In order to be convicted of robbery with a dangerous weapon the State must show (1) an unlawful taking or an attempt to take personal property from the person or in the presence of another; (2) by use or threatened use of a firearm or other dangerous weapon; (3) whereby the life of a person is endangered or threatened. *State v. Beaty*, 306 N.C. 491, 496, 293 S.E.2d 760, 764 (1982), *overruled on other grounds, State v. White*, 322 N.C. 506, 518, 369 S.E.2d 813, 819 (1988).

The evidence in the instant case, taken in the light most favorable to the State, was clearly sufficient to show that Monroe robbed Arlena Redd with the use of a dangerous weapon. It is undisputed that Monroe went to the home shared by Star Jackson and Arlena Redd, brandishing a knife and an axe handle. Upon entering the house, Monroe struck Ms. Jackson with an axe handle. He then struck Ms. Redd with the axe handle, and both women fell to the floor. Monroe then shot Ms. Jackson. When Ms. Redd regained consciousness, she begged Monroe not to kill her, saying she would tell him where the drugs were if he would not kill her. Monroe took his knife and started stabbing Ms. Redd. After murdering both women, Monroe took $400 and "ten rocks" of cocaine from the floor, while defendant observed. Defendant's own statements showed that Monroe was upset with both women, "because Star *and* Arlena wouldn't sell him any dope" and because they "f---- him over with some drugs." (Emphasis added). Also, defendant stated that, prior to going to the victims' house, Monroe told him that he was going to "get *those bitches*." (Emphasis added). The State presented further evidence which showed that both women had plastic bags with a white substance in them in their clothing when they were killed.

The above evidence, taken in the light most favorable to the State, is sufficient to support the jury's finding that defendant, acting in concert with Monroe, was guilty of robbery with a dangerous weapon of Arlena Redd, and of her murder, committed in the perpetration of the robbery. We hold, therefore, that the trial court did not err in denying defendant's motions to dismiss at the conclusion of all the evidence.

[7] In his next assignment of error, defendant contends that the trial court erred in failing to exercise its discretion when it denied the jury's request for a written copy of instructions regarding

robbery with a dangerous weapon. Shortly after the jurors retired to the jury room to deliberate, the jury sent a note through the bailiff to the trial judge, which read: "May we have a copy of Judge's instructions?" The trial judge responded as follows:

> There used to be a law on the books that upon a request of a juror or any counsel or party, the Court had to reduce instructions to writing and sign them and deliver it to the jury. Since that has been repealed, I don't think I'll try to do that.

The judge had the entire jury brought back into the courtroom, whereupon he stated that there was no written instruction, per se, that existed that could be delivered to the jury, so he must deny the request. The jury foreman then asked if there was a list available with the seven criteria for robbery with a dangerous weapon. The trial judge replied that he did not have a paper which would list the criteria but that he could reinstruct the jury as to robbery with a dangerous weapon and list the elements, and in so doing, give the jury the final mandate as to each count. The trial judge asked the foreman if that was desired, and the foreman responded affirmatively. The trial judge then instructed the jury on the elements of robbery with a dangerous weapon, and gave the mandate as to each count.

Defendant argues that the trial judge erred, not in denying the request, but in failing to exercise his discretion at all. As support, defendant relies primarily upon *State v. Ashe*, 314 N.C. 28, 331 S.E.2d 652 (1985), and *State v. Lang*, 301 N.C. 508, 272 S.E.2d 123 (1980). In *Ashe*, this Court held that the trial court committed error by refusing the jury foreman's request to review testimony on the ground that the testimony was not available. 314 N.C. at 34-35, 331 S.E.2d at 656-57. The Court concluded that the trial judge's response indicated that he could not permit review of the transcript and therefore did not exercise his discretion in denying the request. *Id.* at 35, 331 S.E.2d at 657. In *Lang*, the trial court also denied the jury's request for review of the transcript. As in *Ashe*, the trial judge in *Lang* responded to the request by saying that there was no transcript available. This Court concluded that this response was not an act of discretion and that the denial of the request as a matter of law was therefore erroneous. *Lang*, 301 N.C. at 511, 272 S.E.2d at 125.

We believe that the trial judge in the instant case did exercise his discretion. First, the judge realized that he was no longer re-

quired by law to give the instructions in writing. Second, realizing that he had the authority to reinstruct the jury, the judge decided to do so orally, and he did. *See generally State v. Prevette*, 317 N.C. 148, 345 S.E.2d 159 (1986) (under N.C.G.S. § 15A-1234, trial judge has discretion in determining whether to provide additional instructions to the jury). Unlike the responses of the judges in *Ashe* and *Lang*, the response of the judge in the instant case does not indicate that he believed that he did not have the authority to grant the request. Instead, the response indicates that because the instructions simply did not exist in writing at the time the request was made, reinstructing the jury orally would serve the same purpose as written instructions and would be more efficient, given time constraints. For these reasons, we hold that the trial judge did exercise his discretion in deciding to deny the request and therefore committed no error.

In his remaining assignments of error, defendant combines three arguments. First, he argues that the trial judge erred in refusing to instruct on "mere presence," while reinstructing the jury on the elements of robbery with a dangerous weapon, thereby placing undue emphasis on "acting in concert." Second, defendant argues that the trial judge erred in omitting an instruction on reasonable doubt in his final mandate to the jury regarding robbery with a dangerous weapon. Finally, defendant contends that the trial judge erred by giving a confusing response to a question by the jury as to whether finding defendant guilty of robbery with a dangerous weapon would mean that defendant was automatically guilty of felony murder. For the reasons which follow, we find defendant's assignments of error to be without merit, and we therefore reject them.

[8] Defendant argues that in the original oral instruction, the term "acting in concert" was defined once and used at least thirty other times throughout the instruction. In the reinstruction, the term was used eight additional times. Defendant points out that his sole defense was that he was "merely present" during the commission of the crimes, while the State's theory was that defendant "acted in concert" with Monroe. Defendant argues that the repetitious reference to acting in concert placed undue emphasis on the State's theory, which the court did not counterbalance with an instruction on mere presence. We disagree.

**STATE v. BROMFIELD**

[332 N.C. 24 (1992)]

Review of the record reveals that the substance of defendant's request that the trial court reinstruct on mere presence if it instructed on acting in concert was satisfied. There were two reinstructions on robbery with a dangerous weapon. In the first reinstruction in which the trial judge merely set forth the elements of robbery with a dangerous weapon, the trial judge did not instruct on mere presence or acting in concert. In the second reinstruction, the trial judge instructed on both "mere presence" and "acting in concert." N.C.G.S. § 15A-1234 provides a trial judge with discretion in instructing a jury. *State v. Prevette*, 317 N.C. 148, 345 S.E.2d 159. A judge is not required to repeat instructions if he chooses not to do so. *State v. Hockett*, 309 N.C. 794, 309 S.E.2d 249 (1983). Here, however, the judge chose to repeat the instructions, and he did so substantially in accordance with defendant's request. We believe that he acted within his discretion, and we reject defendant's assignment of error.

[9] Next, defendant argues that the trial judge erred in omitting the instruction to the jury to acquit if it had a reasonable doubt as to any of the elements of robbery with a dangerous weapon. This omission was brought to the attention of the trial judge by defense counsel, and the trial judge agreed to correct the instruction the next morning when court resumed. The trial judge did exactly that. We hold, therefore, that any error in the final mandate was cured by the trial judge's reinstruction on reasonable doubt.

[10] Finally, defendant argues that the trial court erred in the manner by which it responded to a question by the jury. After being reinstructed on robbery with a dangerous weapon, and after resuming deliberations, the trial judge received a note which said, "If [defendant is] found guilty of robbery with a dangerous weapon, must [the jury] automatically find him guilty of felony murder?" Before responding, the trial judge solicited comment from both counsel. The following occurred:

> MR. PARISH [Defense counsel]: I would request that you ask the Foreperson to see if she can articulate the question. I mean I suspect that your hypothesis is correct, but I would like for you to find out what the question is. If your hypothesis is correct, I would ask you, as you have previously instructed, to consider the charges separately and the counts separately.

The prosecutor had no comment, and the jury was conducted back into the courtroom. The jury foreman repeated the question, which

STATE v. BROMFIELD

[332 N.C. 24 (1992)]

was, as anticipated by defense counsel and the judge, whether defendant could be found guilty of armed robbery but not first-degree murder. The judge responded:

> All right. Very well. I'll answer the question this way. If you remember the earlier instruction. You were advised, and I advise you again that you're to consider each case separately on its own merits, remembering the elements and the instruction that was given. Do you feel that answers the question?

After a bench conference in which defense counsel asked if the judge had said "each count or each charge," the trial judge clarified the instruction:

> I think I said that you're to consider each case separately on its own merits, Each case, however contains two counts. When I said "case," I meant count. You're to consider each count in each case separately, independently. Is there any other question?

The jury resumed deliberations. Upon inquiry by the trial court as to whether there were any further matters for the State or for the defendant, the prosecutor and defense counsel answered no. Shortly thereafter, the jury returned with the verdicts.

The trial judge's response to the jury's question was carefully designed to prevent confusion by the jury. He first consulted with counsel for defendant and the State. He then had the foreman repeat the question, prior to attempting to respond. The judge instructed the jury to consider each charge separately. He then clarified this by instructing the jury to treat each count separately, in accordance with defense counsel's suggestion. We find no error in the trial judge's response to the jury's question.

In defendant's trial, we find

No error.

Justice LAKE did not participate in the consideration or decision of this case.