810 A.2d 449

Jonathan D. SMITH,

v.

STATE of Maryland.

No. 23, Sept. Term, 2002.

Court of Appeals of Maryland.

Nov. 4, 2002.

Geraldine K. Sweeney, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

Following his conviction by a jury in the Circuit Court for Talbot County of felony murder and daytime housebreaking, petitioner was sentenced to life imprisonment. That judgment was affirmed by the Court of Special Appeals. We granted *certiorari* to consider whether the trial court erred (1) in excluding evidence that petitioner asserted would impeach one of the State's principal witnesses and a co-defendant, and (2) in refusing to re-instruct the jury that a person's mere presence at the scene of a crime does not suffice to prove that the person committed the crime. As we find no error in either ruling, we shall affirm the judgment of the Court of Special Appeals.

## BACKGROUND

Adeline Wilford was murdered in her home on January 5, 1987. She died from loss of blood caused by multiple stab and cutting wounds inflicted with several knives in a most gruesome manner. A number of the wounds were described as defensive wounds, caused as she attempted to shield herself from the attack. From the evidence found at the scene, the police concluded that intruders had entered the house through a window in the utility room, that they were apparently looking for money or property, that Ms. Wilford returned home while they were in the house, and that one or more of them killed her. She still had her coat on when her body was discovered, her keys were in the back door, unpacked groceries were on the kitchen table, the living room and an upstairs bedroom were in disarray, and her pocketbook, wallet, credit

cards, an undetermined amount of cash, and some jewelry were missing. Although fingerprints were recovered from the utility room window and bloody footprints were found on the kitchen floor and front porch, the police were unable to make an identification from them. None of the missing property was ever recovered. Despite following every lead, the police could not develop a suspect, and the case remained more or less dormant for about 12 years.

In 1999, Ms. Wilford's son, upset at the status of the case, offered a reward of $10,000 for information leading to the arrest of his mother's murderer(s) and an additional $15,000 for information leading to the conviction of the murderer(s). Upon learning of that reward, petitioner's aunt, Beverly Haddaway, contacted the State Police and gave them information indicating the involvement of petitioner and two other persons, David Faulkner and Ray Andrews. As best we can tell, she informed the police that she had encountered the three of them near the scene of the crime on the day of its commission and of a conversation that they had at the time. Ms. Haddaway later testified about that encounter. As a result of the information she supplied, the police proposed that Ms. Haddaway be fitted with a body wire, that she engage petitioner in a conversation regarding the murder, and that the conversation be recorded. Ms. Haddaway agreed, and on April 11, 2000, she invited petitioner to her house. As they were moving items from her shed to her car, she asked petitioner about the incident and recorded some incriminating responses.

As noted, Ms. Haddaway said that she had seen petitioner, Faulkner, and Andrews near Ms. Wilford's home at about the time of the murder. As she later testified, she was driving home with a friend when she came across the three boys on foot emerging from a cornfield. She stopped and engaged them in conversation. They said that they were waiting for a ride, and, after a while, a truck arrived and they got in. Ms. Haddaway noticed that petitioner was not wearing a coat and that his tee-shirt was flecked with red dots. Petitioner told her at the time he had killed a dog with a knife because it had bitten him. The taped conversation was laced with references

to their encounter that day. Eventually, petitioner admitted that he knew Ms. Wilford had money, that he and Faulkner had stabbed her, and that the money taken was split three ways.

Two weeks later, the police took petitioner to the station for questioning. After receiving his *Miranda* warnings, petitioner orally acknowledged that he, Faulkner, and Andrews had gone to Ms. Wilford's home, that Andrews remained outside but that, while he and Faulkner were in the house, Ms. Wilford returned, and that "when he noticed her she was standing in front of him screaming and that David Faulkner was stabbing her." Petitioner described what Ms. Wilford was wearing, including her blue coat, and said that "she was fighting and moving her arms about," which would account for the defensive wounds. When the police asked whether petitioner, himself, had stabbed her, he asked for an attorney and questioning ceased.

There was no physical evidence connecting petitioner to the murder. The evidence against him came from Ms. Haddaway's testimony about the encounter near the scene on the afternoon of the murder, the taped statement, Sergeant Bollinger's testimony about the oral statement given by petitioner, testimony by the co-defendant Andrews, and the testimony of a one-time cellmate of petitioner at the Talbot County Detention Center—a former police officer awaiting sentencing for bank robbery. Andrews testified pursuant to a plea agreement under which he entered an *"Alford"* plea of guilty to involuntary manslaughter coupled with a recommended sentence of five years in prison. Andrews said that he waited outside while petitioner and Faulkner went into the house and that he later joined them running across the field until they came to the road where they met Ms. Haddaway, and that petitioner told her the story about killing a dog. After leaving Ms. Haddaway, they went to petitioner's house, where petitioner and Faulkner pulled money from their pockets. Andrews said that he got none of the money and that petitioner and Faulkner never told him what happened in the house.

Andrews and petitioner have a familial connection; their respective wives are sisters.

The cellmate, Michael Snow, said that he asked petitioner whether he really killed "the woman," and that he replied in the affirmative. When asked how, petitioner moved his folded hand "like he was holding something" and made a "kissing-like" sound with his mouth. When asked why, he told Snow that she had startled him when she came in, that he was fighting with her and that she bit him, and that "when she bit him he said he went crazy."

Petitioner attacked this evidence on a number of grounds. He established that he had a profound hearing loss since childhood, that with his hearing aid he could hear only about 25% of what is said, that he was an excellent lip reader, "in the area of 55–60%," and that "he's cuing" or guessing, as to the remaining 15% to 20%. The witnesses who testified about conversations with petitioner were questioned regarding his ability to understand the conversation. His principal defense, however, was that he was "set up" by Ms. Haddaway and Andrews. The first issue before us arises from that defense.

## DISCUSSION

### The Alleged Conspiracy

In his opening statement, defense counsel asserted the defense position to be that petitioner "is a patsy in this case" and suggested that he was "framed" by his aunt, Ms. Haddaway, because of animosity between her and her brother, petitioner's father. He did not attempt to explain the nature or derivation of that animosity, noting only "her brother whom she despises." Counsel pointed out later that Ms. Haddaway had collected the $10,000 reward offered for information leading to petitioner's arrest and asserted that she was looking as well to claim the additional $15,000 offered for information leading to his conviction. He also brought out that Ms. Haddaway had visited Andrews in jail.

The aspect of the "patsy" defense that produced the first complaint in this appeal arose during the cross-examination of

Andrews. Petitioner's attorney indicated that he wanted to establish a conspiracy between Ms. Haddaway, Andrews, and Grayson Eckel, the lawyer who was representing Andrews. The thrust of the alleged conspiracy was that petitioner's father had owned a tract of land which, if the father died intestate, petitioner would inherit and that, immediately before trial, counsel learned that Mr. Eckel, who also represented Ms. Haddaway's daughter, Laci Janda, produced a holographic will leaving the land to Ms. Janda. Although he mentioned a "proffer," counsel never made a formal offer of proof or indicated what questions he wanted to ask or what witnesses, if any, he intended to call. He said only that he wanted "to attempt to lay a foundation for questioning Beverly Haddaway later," to establish "that there's motivation and bias on the part of [Andrews]," and "to establish that [Andrews] is part of a conspiracy or a deal with Beverly Haddaway that involves her collecting reward money and that it involved her ... in a will contest or dispute in which ... her daughter, Laci Janda, has acquired real estate."

The positing of this theory produced considerable discussion. The prosecutor noted that the father died after charges had already been filed against petitioner and said that she failed to see the relevance of his disposition of his land. The court inquired several times about the relevance, asking first what the will had to do with the criminal case. The response was that Mr. Eckel "is apparently representing two conflicting, opposing interests in this matter"—Andrews in this case and Ms. Haddaway's daughter in the will case. The court had trouble seeing how that was a conflict, and the best counsel could respond was that Andrews's lawyer was helping Ms. Haddaway's daughter obtain the land by having Andrews help convict petitioner. The court characterized the theory as confusing, to which counsel responded: "I agree it's confusing. But I don't see why the jury should be painted a pristine picture that shows there is no problems. And it's not confusing when in fact it is confusing, has been confusing to all of us from the very beginning." With that bit of supposed clarification, the court held that the point sought to be made was

irrelevant. Counsel then completed his cross-examination of Andrews without further reference to the matter, and, when he later recalled Ms. Haddaway as a defense witness, he asked no questions regarding the will or any other aspect of the alleged conspiracy.

Counsel returned to his conspiracy theory in closing argument, but cast it entirely in terms of Ms. Haddaway's seeking to collect the reward money. He explained that petitioner was a "patsy" because Haddaway wanted to collect the reward and, in order to do so, she needed to supply information, and "so she has an opportunity to set up with Mr. Andrews a situation in which Mr. Andrews is going to take a small fall [and] someone else can take a big one, her nephew."

In this appeal, petitioner urges that the court erred in excluding evidence "tending to show that the State's main witness had an interest in the outcome of the proceeding and had a motive to testify falsely." Citing *Gray v. State*, 368 Md. 529, 547, 796 A.2d 697, 707 (2002), he posits that "a defendant, within evidentiary and procedural restraints, is always entitled to present his full defense to the trier of fact," which in this case included the accusation that "there was a conspiracy between [Haddaway and Andrews] (and perhaps Eckel), the object of which was to secure the wrongful conviction of Petitioner, collect the reward money, and secure the inheritance of Haddaway's daughter of the real property of Petitioner's father."

Though acknowledging, from *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 683 (1986), that judges retain "wide latitude" to impose reasonable limits on cross-examination, to avoid "harassment, prejudice, confusion of issues ... or interrogation that is ... only marginally relevant," petitioner nonetheless asserts that he established a sufficient threshold to be entitled to proceed further with his theory, and that the court both erred as a matter of Constitutional law and abused its discretion in not allowing him to do so. He contends that the court was wrong in relying on the fact that his father died after the charges were filed against

him, which he regards as irrelevant, and on the fact that Ms. Janda, rather than Ms. Haddaway, was the devisee of the land, and he stresses his right to attempt to establish bias and pecuniary interest on the part of State's witnesses. Citing *Clark v. State*, 364 Md. 611, 660, 774 A.2d 1136, 1165 (2001), he notes that "a proffer to permit an initial question regarding credibility needs but minimal support"—little more than an "articulable suspicion . . . to believe that the facts elicited will be relevant to credibility."

We have no disagreement with the general propositions posited by petitioner that he had a right to present his defense to the jury, that evidence of bias and interest on the part of adverse witnesses is always relevant, and that such bias or interest is always the proper subject for cross-examination, which may not be *unreasonably* denied or limited. *See Marshall v. State*, 346 Md. 186, 695 A.2d 184 (1997). Those propositions are subject, however, to two paramount rules of evidence, embodied both in case law and in Maryland Rules 5–402 and 5–403. The first is that evidence that is not relevant to a material issue is inadmissible.[1] The second is that, even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See Ware v.*

---

1. Prior to the adoption of the Maryland Rules of Evidence (Title 5 of the Maryland Rules), the case law distinguished between relevance and materiality. As Professor McLain explains: "The term 'relevance' refer[red] to the required relationship between the evidence offered and the fact that it is offered to prove; the term 'materiality' refer[red] to the required relationship between that fact and an issue which is the proper subject of proof in the case." LYNN MCLAIN, MARYLAND EVIDENCE § 401.1 (1987 ed.). In adopting the Maryland Rules of Evidence, we followed the Federal approach and that of nearly 40 States and collapsed those concepts into one, using an expanded definition of "relevance" to mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5–401. Both concepts remain viable, however. To be relevant under Rule 5–401, the fact sought to be proved must be one "that is of consequence to the determination of the action," and the evidence must make the existence of that fact more probable or less probable.

*State,* 348 Md. 19, 67–68, 702 A.2d 699, 723 (1997); *Merzbacher v. State,* 346 Md. 391, 413–14, 697 A.2d 432, 443 (1997).

The exploration of bias or interest on the part of an adverse witness—Ms. Haddaway and Mr. Andrews in this case—is always material, and, indeed, petitioner was permitted to expose that bias or interest. He got before the jury that Ms. Haddaway had waited nearly 12 years to go to the police and did so only after learning of the reward, that she had already received $10,000 of the reward and was looking to claim the additional $15,000 offered for conviction. He got before the jury that Andrews was testifying pursuant to an *Alford* plea agreement to a much reduced charge with a recommended sentence not to exceed five years in prison. That kind of evidence was certainly relevant to establishing the material fact of bias or interest.

■ The conspiracy theory arising from the father's will, however, was so unclear, so amorphous, and so tenuous as to strain any connection with bias or interest on the part of Haddaway or Andrews. It necessarily rested on the tacit premise that Ms. Haddaway, in concert with Mr. Andrews and/or Mr. Eckel, somehow importuned the father to devise the land by will to Ms. Janda rather than allow it to devolve by intestacy to petitioner. Even if we were to excuse the lack of a formal proffer of evidence to support such a conclusion, there was no indication of what counsel wished to explore— what questions he wanted to ask. In the face of an objection on the ground of relevance, there was no assertion that he intended to inquire as to any of the facts or circumstances that might serve to establish a connection between the will and the testimony of Haddaway or Andrews—(1) what the overall relationship was between petitioner and his father, (2) what the relationship was between the father and the niece, Ms. Janda, (3) when the holographic will was written—whether before or after the father may have become aware of petitioner's alleged involvement in Ms. Wilford's murder, (4) what the father's health and mental state were when the will was executed, (5) whether the will provided any other bequest to

petitioner in lieu of the land, (6) whether there were ever any discussions between the father and Ms. Haddaway, or Mr. Andrews, or Mr. Eckel regarding the land, and, if so, when they occurred, or even (7) whether petitioner was expecting to inherit the land.

We do not suggest that petitioner was required to establish these things in advance, before being allowed to proceed. Had he offered even a rudimentary basis for a connection between the will and the testimony of Haddaway or Andrews, he would have been entitled to some leeway to develop it. Here, however, there was nothing. The isolated fact that, at some unknown point, petitioner's father drew a will that devised land of unknown value to his niece makes neither more probable nor less probable that Ms. Haddaway or Mr. Andrews had a motive to testify falsely against petitioner.

If there *was* any relevance inferrable from this void, it was certainly marginal at best, which invokes the discretion accorded both under the cases cited and under Maryland Rule 5–403 to exclude even relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Holding aside the obvious prejudice to Mr. Eckel—accusing a lawyer, who would likely be unable to testify in response, of criminal conspiracy to suborn perjury—defense counsel admitted that the issue was confusing, as indeed it was. Had counsel made a clear proffer or even identified the questions or types of questions he desired to ask, the trial court may have had some better idea of how to draw a balance under Rule 5–403. On this record, however, we cannot say that the judge abused his discretion in precluding counsel from wandering off onto smoke-filled tangents.

### *The Re–Instruction*

Among other crimes, petitioner was charged with daytime housebreaking, which is a felony, and first degree felony murder based on the daytime housebreaking. The court instructed the jury that, in order to convict petitioner of

daytime housebreaking, the State had to prove that there was a breaking of another's dwelling house with the intent to steal goods therefrom and "that the Defendant was the person who committed the housebreaking." The court defined "breaking" for the jury as "the creation of an opening, such as breaking or opening a window or pushing open a door." In order to convict under that instruction, the jury had to find that petitioner created such an opening with the intent to steal goods.

With respect to felony murder, the court instructed in accord with the Pattern Jury Instructions (MPJI–Cr.4:17.7):

"In order to convict the Defendant of first degree felony murder the State must prove, one, that the Defendant or another participating in the crime with the Defendant committed a felony or felonies. Two, that the Defendant or another participating in the crime killed Adeline Curry Wilford. And three, that the act resulting in the death of [Ms. Wilford] occurred during the commission of the felonies. Felony murder does not require the State to prove that the Defendant intended to kill the victim."

As part of its introductory general instructions, prior to instructing on the elements of any of the charged offenses, the court informed the jury that "[a] person's presence at the scene of a crime without more is not enough to prove that the person committed the crime" but that "a person's presence at the time and place of a crime is a fact in determining whether the Defendant is guilty or not guilty." That instruction, also taken from the Pattern Jury Instructions (MPJI–Cr.3:25) is sometimes referred to as the "mere presence" instruction.

After some period of deliberation, the jury sent the following question to the judge: "In the case of first degree felony murder, does the evidence have to prove that the Defendant committed the murder or only that he was present during the commission of a felony when the murder occurred?" Without objection, the court responded by repeating the felony murder instruction it had given. Petitioner then asked the court to

repeat as well the "mere presence" instruction, which the court declined to do. Petitioner contends that the court abused its discretion in refusing to repeat the "mere presence" instruction. Although no objection was made to the initial instructions, petitioner now contends that they must have seemed contradictory to the jury: "(1) mere presence at the scene of the crime does not make you guilty; and (2) mere presence at the scene of a felony does make you guilty of murder if it occurs during the felony." Instead of addressing that seeming contradiction by repeating the "mere presence" instruction, petitioner avers that the court exacerbated the problem by repeating only the felony murder instruction. We find no error.

■ Maryland Rule 4–325(a) requires the court to instruct the jury at the close of the evidence and permits the court to supplement those instructions at a later time. In *Mitchell v. State,* 338 Md. 536, 540, 659 A.2d 1282, 1284 (1995) (quoting *Howard v. State,* 66 Md.App. 273, 284, 503 A.2d 739, 744–45, *cert. denied,* 306 Md. 288, 508 A.2d 488 (1986)), we made clear that "[t]he decision to supplement [jury] instructions and the extent of supplementation are matters left to the sound discretion of the trial judge, whose decision will not be disturbed on appeal in the absence of a clear abuse of discretion."

Bearing on the exercise of that discretion is the principle, embodied in Maryland Rule 4–325(c), that the court "need not grant a requested instruction if the matter is fairly covered by instructions actually given." The repetition of the felony murder instruction, in our view, fairly and accurately addressed the jury's question. It told the jury that, to convict of felony murder, it must find that either petitioner or someone participating in the crime *with* petitioner committed a felony, that petitioner or someone participating in the crime with petitioner killed Ms. Wilford, and that the act resulting in Ms. Wilford's death occurred during the commission of the felony. That told the jury that petitioner did not have to commit the murder himself, but it also told the jury that he or someone

participating with him had to have committed the felony and the killing. The necessary implication was that mere presence at the scene, without more, would not suffice.[2]  In convicting petitioner of daytime housebreaking under the instructions given with regard to that offense, the jury necessarily concluded, in any event, that he was not merely present at the scene but actually broke into the house and thereby participated in the felony.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.

ELDRIDGE, J., and CATHELL, J., dissenting.

We totally fail to comprehend what legal issue of public importance is presented by this case so as to justify the issuance of a writ of certiorari.  The writ should be dismissed as improvidently granted.

---

**2.**  Petitioner's reliance on *State v. Bromfield*, 332 N.C. 24, 418 S.E.2d 491 (1992), is misplaced.  The defendant there was charged with robbery, armed robbery, and felony murder arising from the robbery.  After deliberating for a time, the jury requested the court to provide its written instruction on robbery, which the court declined to do.  It did, however, twice give an oral re-instruction on that offense.  Among the issues raised on appeal was the court's refusal to include a "mere presence" instruction as part of its re-instruction on robbery.  The North Carolina Supreme Court noted that the "mere presence" instruction *was* included in the first re-instruction and found no error in its omission from the second re-instruction.  It held, as we have held, that "[a] judge is not required to repeat instructions if he chooses not to do so." *Id.* at 502.