STATE OF NORTH CAROLINA v. DARON LEON FARMER

No. 398A91

(Filed 8 January 1993)

1. **Searches and Seizures § 12 (NCI3d)— no detention or seizure of defendant before arrest—probable cause for arrest—physical evidence—seizure incident to arrest and under warrant**

Defendant was not "detained" or "seized" within the meaning of the Fourth Amendment to the U.S. Constitution or Art. I, § 20 of the N.C. Constitution where defendant's encounter with the officers took place on a public street; the officers wore no uniforms and displayed no weapons; they did not summon the defendant into their presence but approached him and identified themselves as law officers; the officers requested, but did not demand, information concerning the defendant's identity and place of residence and asked why he was covered with what appeared to be blood; and the officers asked defendant why he had given them a false name after it became apparent that he had done so. Furthermore, officers had probable cause to arrest defendant for murder when they received information from an individual that defendant had left the individual's house headed in the direction of the victim's residence at 8:30 p.m. on the date the victim was killed, and that when defendant returned at 11:00 p.m., he had blood on his face and clothes and in his ears. Therefore, physical evidence seized at the time of defendant's arrest and during the later execution of a search warrant supported by probable cause was properly admitted in defendant's trial for first degree murder.

**Am Jur 2d, Searches and Seizures §§ 10, 37.**

**Constitutionality of searching premises without warrant as incident to valid arrest—Supreme Court cases. 108 L. Ed. 2d 987.**

2. **Evidence and Witnesses § 2516 (NCI4th)— murder—plan to rape victim—defendant's seriousness—cross-examination prohibited—harmless error**

Where a witness testified that defendant had asked him to be a lookout while defendant raped an elderly woman in Stokesdale, any error in the trial court's refusal to permit

defense counsel to ask the witness certain questions concerning whether defendant was serious about raping the woman did not affect the outcome of the trial and was harmless error given the strength of the State's evidence against defendant and the fact that defendant was allowed to elicit other testimony regarding the nature of the witness's conversations with defendant about raping a woman in Stokesdale.

**Am Jur 2d, Witnesses § 812.**

3. **Evidence and Witnesses § 3191 (NCI4th) — admission of non-corroborative written statement — harmlessness**

Assuming arguendo that a witness's written statement to an officer contradicted her trial testimony as to who defendant told her suggested breaking into a murder victim's home and was thus not corroborative, the admission of her statement into evidence was harmless where the witness's testimony supported an inference of concerted action by defendant and another; such evidence, if believed by the jury, would have required conviction of the defendant on a theory of concerted action regardless of who first suggested breaking into the home; and defendant failed to show a reasonable possibility that a different result would have been reached at trial had the witness's written statement been excluded.

**Am Jur 2d, Witnesses §§ 929, 938.**

4. **Homicide § 705 (NCI4th) — premeditation and deliberation — failure to give requested special instruction — harmless error**

Even if the trial court erred in failing to give defendant's requested instruction that the mere existence of grossly excessive force or brutal circumstances would not, standing alone, be sufficient to support a finding of premeditation as those factors are as likely to exist in an unpremeditated killing as in a premeditated and deliberate murder, defendant was not prejudiced by this omission where the jury returned a verdict finding defendant guilty of first degree murder both under the felony murder theory and under the theory of premeditation and deliberation, and it would thus not have been reversible error for the trial court to have failed to give any instructions concerning premeditation and deliberation.

**Am Jur 2d, Trial §§ 1080, 1093, 1094.**

STATE v. FARMER

[333 N.C. 172 (1993)]

**Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.**

Appeal of right, pursuant to N.C.G.S. § 7A-27(a), from a judgment entered by Ross, J., in the Superior Court, Guilford County, on 22 October 1990. Heard in the Supreme Court on 3 November 1992.

*Lacy H. Thornburg, Attorney General, by G. Lawrence Reeves, Jr., Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for the defendant-appellant.*

MITCHELL, Justice.

The defendant, Daron Leon Farmer, was tried in a capital trial, and the jury found him guilty of first-degree murder. At a separate sentencing proceeding, pursuant to N.C.G.S. § 15A-2000, the jury recommended a sentence of life imprisonment. The trial court entered judgment accordingly. The defendant appealed to this Court as a matter of right.

The State's evidence introduced at trial tended to show, *inter alia*, the following. On 13 November 1989, Norva Martin made arrangements with Margaret Robinson, the victim, to walk together at the Circle Mall. On the following morning, Martin called Robinson by telephone, but she got no answer. Martin then drove to Robinson's home in Stokesdale, a community in Guilford County. Martin knocked on the door, but no one answered. Martin then went to the Webco station located across the street from Robinson's home and asked Edd Shelton to accompany her back to the home. Upon arriving at Robinson's home, Shelton looked into the windows and checked the exterior of the house thoroughly. However, there was still no sign of Robinson, so Martin and Shelton returned to the Webco station and asked Phil Webster to call the Guilford County Sheriff's Department.

At 7:42 a.m. on 14 November 1989, Deputy Sheriff Moselle Kelly of the Guilford County Sheriff's Department was dispatched to the Webco station. After talking there with Webster, Deputy Kelly drove to Robinson's home. Deputy Kelly became suspicious when she saw a window up with the screen pushed in, so she

looked into the kitchen window and saw the toes of a person lying on the floor. Deputy Kelly also heard water running in a sink.

As a result of her observations, Deputy Kelly advised her dispatcher by radio that there was a person in the house and that she would have to make a forced entry. Deputy Kelly then returned to the Webco station where she encountered Marty Southard, a volunteer fireman, and asked him to accompany her to Robinson's home. While at Robinson's home, Southard looked into the kitchen window and saw the victim's nude body on the floor. Southard then enlisted the assistance of Winfree Dunlap, a passing motorist. With Dunlap's help, Southard broke out a panel in the back door and entered the house. After noticing a large amount of blood on the kitchen floor, Dunlap checked the victim for vital signs, but found none. Dr. Roger Thompson, a forensic pathologist in Chapel Hill, later conducted an autopsy and determined that Margaret Robinson's death was caused by blunt force injuries.

Michael Wayne Smith testified that he had known the defendant since they had attended high school together in Guilford County. One morning at approximately 11:00 a.m., Smith encountered the defendant who was walking in front of Smith's grandmother's house on Ellisboro Road. Smith and the defendant then spent some time at the defendant's home and at a place called Jack's Store. While the two men were together that morning, the defendant asked Smith to go with him to Stokesdale in order to assist him while he raped a woman. The defendant told Smith that the woman lived in a white house and that she was blonde and about fifty or sixty years of age. The defendant told Smith that he had seen this woman before through a window while she was taking a bath. The defendant then told Smith that he was going to cut the power off, kick in the door, and commit a rape. The defendant also stated that he wanted Smith to be the lookout and that Jamie Shoemaker would take them to the woman's house. The defendant further indicated that the rape would occur at approximately 2:30 or 3:00 a.m. and that he and Shoemaker would pick Smith up before 6:00 p.m.

Following this conversation, Smith went home and watched television. At approximately 6:00 p.m., Smith went down the road to meet the defendant and Shoemaker. However, after waiting for about thirty minutes, Smith concluded that the two men were not coming for him.

On direct examination, Smith testified that his conversation with the defendant took place on a morning in November 1989. On cross-examination, however, he testified that he did not know when the conversation occurred.

Timmie Tilley testified that he had first met the defendant while they were attending elementary school and that they had grown up in the same neighborhood. When they were children, the defendant frequently spent the night at Tilley's home. Three or four years prior to the Robinson killing, the defendant had lived next door to the victim.

On a day in November 1989 at approximately 6:30 p.m., the defendant visited Tilley's house. At approximately 7:00 p.m., Tilley, the defendant, and three acquaintances went to Bradley Rice's house, where they drank beer and smoked marijuana. At approximately 9:00 p.m., the defendant left after saying that he was going to get something from the store.

The defendant returned to Tilley's home at approximately 11:00 p.m. Tilley was sitting in a parked car in his back yard when he looked up and saw the defendant standing next to his car. Tilley asked the defendant to get into the car. At that time, he noticed that the defendant was acting sick, holding his head down and holding his stomach. Approximately five minutes later, Ronnie Buchanan drove up in his car, and Tilley went over to speak with him. Initially, the defendant also walked over to Buchanan's car, but he turned around and walked back to Tilley's car and sat in the passenger's seat.

After talking with Ronnie Buchanan, Tilley and the defendant went inside Tilley's home. Earlier that day, Tilley had told the defendant that he could spend the night there. Tilley noticed that the defendant had blood on his face, neck, forehead and ears. Tilley asked the defendant what had happened, and the defendant said that a gunshot wound had caused him to bleed. Tilley and the defendant then went upstairs to Tilley's bedroom and went to sleep.

On the following morning, Tilley's mother called and told him that Margaret Robinson had been killed. When Tilley told the defendant that Robinson had been killed, there was no expression on the defendant's face, and he merely said, "damn." Tilley then told the defendant that he had to leave. The defendant left Tilley's house at approximately 9:00 a.m.

William Lester Mabe testified that he learned about Margaret Robinson's death one day in November 1989. Mabe is a tobacco farmer and lives approximately three miles north of Stokesdale. At approximately 10:00 a.m. on the morning Mabe learned that the victim had been killed, the defendant walked through Mabe's yard, and the two men had a brief conversation. The defendant told Mabe that he had spent the night at a friend's house in Stokesdale and that he was on his way home. During the conversation, Mabe noticed "fresh" scratches on the defendant's face and neck. After this brief conversation with Mabe, the defendant left.

The State's evidence further tended to show that at some point after Margaret Robinson was killed, the defendant had a series of telephone conversations with his mother-in-law, Betty Shields. The defendant at one point told Shields that he did not hurt Margaret Robinson in any way, but that Timmie Tilley had beaten her. The defendant said that he had stayed outside the house while Tilley entered. The defendant told Shields that he had left when "things got out of hand."

At another point, the defendant told Shields that he had met Tilley in front of the victim's house. Tilley already had blood on his person at that time, and the two men left and went to Tilley's house.

In other conversations with Shields, the defendant said that he and Tilley had both entered the victim's home through a window. The defendant said that Tilley had picked up an antique iron that had been on the floor in the home and hit the victim. The defendant said that he was "going through a closet" in the home while Tilley was hitting the victim. The defendant told Shields that the only way he could have gotten blood on his person was by turning the victim over to see whether she was alive.

Lieutenant Roy T. Forrest of the Guilford County Sheriff's Department participated in the investigation of the Margaret Robinson homicide. On 15 November 1989 at approximately 10:00 a.m., Detective Sergeant Steve Shaver told Forrest that two women who live a few houses east of Margaret Robinson's home had said that a young boy named Daron Farmer had peeked into Robinson's windows and had made spiteful comments to her in the past. Phil Webster, the owner of a Webco station located directly across the street from the victim's house, told Forrest that the victim had said that the defendant Farmer had peeked into her windows

and had made derogatory comments to her approximately two or three years before, when Farmer lived next door to the victim. Webster also gave Forrest a physical description of the defendant and told him where the defendant lived.

As a result of the information they had received, Forrest and Shaver decided to ask the defendant some questions. They began driving north on Ellisboro Road toward the defendant's home. At approximately 10:50 a.m., after driving approximately four miles, the officers observed a man who fit the general description of the defendant walking down the road. After passing the man, the officers backed onto the shoulder of the road and stopped their car near him. The officers then got out of the car and introduced themselves to the man. When asked, the man stated that his name was James French. Shortly thereafter, other officers arrived, and the man who had identified himself as James French was identified as actually being the defendant, Daron Leon Farmer. As a result of this and other information received at the scene of the officers' initial encounter with the defendant on Ellisboro Road, Lieutenant Forrest placed the defendant under arrest for the murder of Margaret Robinson.

Upon arresting the defendant, Lieutenant Forrest had him remove his shirt which was placed into an evidence bag. The defendant was then taken to the Guilford County Jail where photographs were taken of his face and upper body. Some of those photographs depicted the scratches on the defendant's face and material around his cuticles and fingernails. The remainder of the defendant's clothes were taken at that time and placed in an evidence bag. A forensic serologist tested the stains on the defendant's clothing and identified them as human blood of a type consistent with that of the victim. Tests on these samples were otherwise inconclusive.

James Gregory of the North Carolina State Bureau of Investigation testified as an expert in fingerprint identification. He and other officers discovered fourteen latent fingerprints and palmprints in the victim's home, including three prints on the bedroom window, seven prints near two doorways leading into the bedroom, a print on the refrigerator in the kitchen, a print on a Doritos cornchip bag found in the bedroom, and a print on the door molding in the doorway between the living room and bedroom. Only four of the latent prints at the scene were of value for identification purposes; those were the fingerprint discovered on the cornchip bag,

STATE v. FARMER

[333 N.C. 172 (1993)]

the fingerprint from the door molding in the doorway between the living room and the bedroom, and two palmprints. One of the palmprints was identified as definitely not having been made by the defendant's palm. In Gregory's expert opinion, the two finger-prints and the other palmprint were those of the defendant.

The State introduced other evidence at trial which is discussed at other points in this opinion where pertinent to the issues raised by the defendant. The defendant introduced no evidence.

[1] By his first assignment of error, the defendant contends that the trial court erred in denying his motion to suppress the State's physical evidence which he contends was obtained as a result of an unconstitutional seizure. The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." At issue in this case is whether the defendant was "detained" or "seized" within the meaning of the Fourth Amendment, either when law enforcement officers initially encountered him on Ellisboro Road or when they questioned him there in their car. We conclude that he was not.

The defendant made a motion in the trial court to suppress the State's physical evidence, which included his fingerprints, clothes, photographs, and blood samples. He argues that the trial court was required to exclude such evidence because it was obtained after he was placed under arrest on the basis of information obtained during an unconstitutional seizure of his person. The defendant bases his argument on the authority of cases such as *Davis v. Mississippi*, 394 U.S. 721, 22 L. Ed. 2d 676 (1969); *Mapp v. Ohio*, 367 U.S. 643, 6 L. Ed. 2d 1081 (1961); *State v. Carter*, 322 N.C. 709, 712-14, 370 S.E.2d 553, 556-57 (1988); and *State v. Accor*, 277 N.C. 65, 81-84, 175 S.E.2d 583, 593-95 (1970).

The trial court conducted a *voir dire* hearing on the defendant's motion. Based upon substantial competent evidence, the trial court made extensive findings of fact. The trial court found, *inter alia*, that Lieutenant Roy T. Forrest of the Guilford County Sheriff's Department and Detective Sergeant Steve Shaver were involved in the investigation of the killing of Margaret Robinson. They talked to several individuals in the neighborhood who told them that Robin-son had experienced problems with a young man named Daron Farmer who had been peeking into her windows and generally

cursing and harassing her during periods ranging from five years to two years prior to the date on which she was killed. The neighbors suggested that the officers' investigation begin with the defendant, Daron Farmer. One of the neighbors gave the officers a physical description of Farmer and directions to the mobile home in Rockingham County where he lived.

Lieutenant Forrest and Detective Sergeant Shaver proceeded along Ellisboro Road toward the defendant's home in Rockingham County. After entering Rockingham County, the officers observed an individual walking along the road approximately four and one-half miles from the crime scene and proceeding in a direction away from the crime scene. The individual they observed matched the physical description they had been given of Daron Farmer.

The trial court further found that:

[U]pon observing the individual, and after having passed him on the Ellisboro Road, Lieutenant Forrest stopped the vehicle approximately 75 to 100 feet past the individual that had been observed walking; thereafter, backed up on the road and parked the vehicle approximately 20 feet ahead of and in front of the individual that had been observed walking on Ellisboro Road;

That Lieutenant Forrest and Detective Sergeant Shaver thereafter exited the vehicle that they had been occupants of, and approached the individual walking on the road;

That at the time they approached the individual, they displayed no weapons, were not in uniform;

. . . .

That after having exited the vehicle and upon approaching the individual that had been walking down Ellisboro Road, that Lieutenant Forrest identified himself as a detective with the sheriff's department by showing his badge and also introduced Detective Sergeant Shaver to the individual that had been walking;

That Lieutenant Forrest and Detective Sergeant Shaver approached the individual to a point of approximately three to four feet;

That Lieutenant Forrest asked the individual his name, and he gave the name of James French. He was then asked

where his home was, and he indicated about three and-a-half miles down the road away from Stokesdale [the crime scene] into Rockingham County;

That during these initial questions, both Lieutenant Forrest and Detective Shaver had the opportunity to observe the individual from a distance of approximately three to four feet; that Lieutenant Forrest observed what appeared to be a blood stain near the knee of the bluejeans; that he observed dark stains on his shirt; that in the left breast area of his shirt, he observed a brown material or substance which, in his opinion, was dried blood or tissue; that he observed four or five fresh scratches, two under his left eye, one under his right eye, one near the tip of his nose, and one on his neck; that these scratches were broad, pink and fresh, not dried or healed over; that he noticed dark brown stains around all of the cuticles of his fingers and under his nails and underneath his forearms; that he concluded those stains were dried blood, and that these observations were made while he was asking the individual where he was headed;

That Detective Sergeant Shaver observed a reddish substance underneath his arms from the elbow to the wrist; that he believed it to be dried blood. He based his belief, in part, on a smell which he sensed at that time. He also observed stains on the clothing of the individual; that he observed scratches on his face which he observed to be fresh with no scabs;

That thereafter, the individual who had identified himself as James French was asked where he spent the night, and he indicated at Timmie Tilley's which he indicated was near a Bi-Rite in Stokesdale; that Lieutenant Forrest knew that the Bi-Rite was less than a quarter of a mile from Ms. Robinson's house, based upon his earlier observations and knowledge.

Lieutenant Forrest asked the individual who had identified himself as James French how he had gotten blood on himself. The man responded that he and some others had killed and dressed a deer the night before.

The trial court further found that:

Lieutenant Forrest asked the individual if he would ride back to Stokesdale with him to confirm with Mr. Tilley concerning

the killing of the deer; that the individual who had identified himself as James French told them that he needed to go to his mother's, that she was expecting him. Lieutenant Forrest thereafter indicated that he would take the individual to his home first and it would not take long to go back to Stokesdale. The individual responded he needed to let his mother know where he was. Lieutenant Forrest again offered to take him home; that the individual made no verbal response thereafter;

That all of this encounter took place on the roadside of Ellisboro Road, in the daylight, on a public road, not in a vehicle; that no weapons were displayed during this encounter; that at no time during this encounter did Lieutenant Forrest or Detective Sergeant Shaver touch the individual who identified himself as James French in any way; that at no time did the individual ask if he was under arrest, nor did he ask if he could leave.

The trial court further found that the officers then stepped approximately twenty feet away from the defendant without indicating to him that he should stay where he was or in any other way indicating that he was not free to go. The officers talked briefly with each other and decided to have someone from the Rockingham County Sheriff's Department meet them there. They also decided to contact the Guilford County Sheriff's Department to determine whether they could obtain any further information about Daron Farmer.

The trial court found that the officers then

went back to the individual who had identified himself as James French and told him that they intended to call the Rockingham County Sheriff's Department. They asked him if he would mind waiting there until members of that department arrived, and the defendant indicated that he did not mind;

That Lieutenant Forrest then asked him if he wanted to sit in the car and wait. He said that he would;

That they then—they being the defendant and Lieutenant Forrest—approached the car; that Lieutenant Forrest opened the back right door; that the individual that had identified himself as James French then entered the vehicle on his own without being touched physically, and that the door to the

vehicle, the right rear door, which was entered by the individual, was left open;

That once in the vehicle, Lieutenant Forrest explained to the individual that he wanted to get some biographical information; asked for his full name, date of birth and address; that he was given the name of James Lee French, a date of birth of January 3, 1968, and an address of Route 1, Box 162-M Ellisboro Road, Stokesdale;

. . . .

That thereafter, within a few moments, information was received by radio from the detective division that . . . [Daron Farmer's] date of birth was January 3, 1968, the same as that given by the individual that identified himself as James French;

That no other conversation was had with the individual during this period; that as of this time, the individual that had been identified as James French was never told that he was under arrest or in custody; he was never told that he was not free to go; no weapons were displayed to him; no force was used in an attempt to restrain him; that he did not ask to leave; he did not ask whether he was under arrest;

That three to five minutes later, two officers from the Rockingham County Sheriff's Department arrived; that Lieutenant Forrest asked them if they knew the person in the car; that one of those officers indicated that he knew the individual and that it was Daron Leon Farmer. When asked how the officer from Rockingham County knew that it was Daron Leon Farmer, he responded by saying that Farmer was on probation for stealing a truck, and that he also knew his family;

That thereafter, after the individual had been identified as Daron Leon Farmer, that Lieutenant Forrest asked the defendant why he had lied about his name, and he said that he had lied because he was on probation about stealing a car in Stokes County;

That thereafter, Lieutenant Forrest received a call from Sergeant Powell of the Guilford County Sheriff's Department who had by then interviewed a Timmie Tilley; that Sergeant Powell related to Lieutenant Forrest that Mr. Tilley had told

him that Daron Farmer had left his, that is, Tilley's, house at approximately 8:30 p.m. on November 14, 1989, headed toward the area of Ms. Robinson's home; that he returned at approximately 11:00 p.m.; that when he returned, he had blood on his face and clothes, and even had blood in his ears;

That thereafter, Captain Shepherd arrived. Along with him were SBI Agents Ed Hunt and Frank Brown, and also Phillip Webster; that at that point, Lieutenant Forrest asked Daron Farmer to step out into the rear of the car; that he did so; that thereafter, Captain Shepherd exited his car, which also contained Phillip Webster, and told Lieutenant Forrest that Mr. Webster had said that the individual was Daron Leon Farmer;

That at that point, Daron Leon Farmer, the defendant, was placed under arrest for the murder of Margaret Robinson.

The trial court further found that after the defendant was placed under arrest for the murder of Margaret Robinson, his shirt was taken because Lieutenant Forrest had earlier noted what appeared to be gray hairs on the shirt. The defendant was then taken to the Guilford County Jail where he was advised of his constitutional rights and indicated that he wanted an attorney present prior to any questioning. As a result, no questions were asked of him, but his fingerprints were taken and photographs were taken of him.

Thereafter, Lieutenant Forrest prepared an application for issuance of a search warrant and a supporting affidavit which included the information obtained during the officers' encounter with the defendant on Ellisboro Road. Based upon the application and affidavit, a magistrate issued a search warrant. The warrant was served upon the defendant, and certain items of evidence were taken as a result, including finger scrapings, blood samples, and other items specified in the search warrant.

Based upon the foregoing and other findings, the trial court concluded:

That at the time the defendant was approached on Ellisboro Road by Lieutenant Forrest and Detective Sergeant Shaver, that the approach was not a seizure of the defendant; that the approach was in a non-threatening manner; that Lieutenant Forrest and Detective Sergeant Shaver had identified

themselves as law enforcement officers; that the conduct was inoffensive and was conduct between members of the public and the police that did not amount to a seizure of the person, and the Court relies upon Florida versus Royer, 460-U.S.— 491, and United States versus Mendenhall, 446-U.S.-544;

That after having inquired of the individual that was approached on Ellisboro Road, after having inquired of his name and where he was heading, that the observations made by Lieutenant Forrest of the physical condition of the individual along with the information which he had previously obtained from Mr. Webster, Sergeant Shaver and other officers at the alleged crime scene, that Lieutenant Forrest had reasonable articulable suspicion that the individual that had been approached was Daron Leon Farmer, and that he had been involved in a criminal offense;

That even if Lieutenant Forrest did not have reasonable articulable suspicion at that point, there was no seizure; that a seizure occurred at its earliest point when the defendant was in the vehicle of Lieutenant Forrest and when he was asked why he had lied about his name;

That as of that point, in addition to the observations made of the physical condition of the individual, significant other information had been acquired which gave reasonable articulable suspicion to Lieutenant Forrest to constitutionally permit the seizure;

That any seizure that occurred prior to the arrest of the defendant was a mere investigative stop which would require only reasonable articulable suspicion, which reasonable articulable suspicion existed, as the Court has concluded, after the observations of the physical appearance of the individual stopped on Ellisboro Road;

That after receiving the information from Sergeant Powell, Lieutenant Forrest had probable cause for the arrest of the defendant.

Based on its findings and conclusions, the trial court denied the defendant's motion to suppress the items of evidence seized at the time of the defendant's arrest and during the later execution of the search warrant.

The defendant contends on appeal that he was "detained" or "seized" in violation of the Fourth Amendment when Lieutenant Forrest and Detective Sergeant Shaver approached him and made inquiries of him on Ellisboro Road, and that the trial court erred in its conclusions to the contrary and in its action in denying his motion to suppress. Therefore, the defendant contends under principles established in cases such as *Florida v. Royer*, 460 U.S. 491, 75 L. Ed. 2d 229 (1983), and *United States v. Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497 (1980), that, even if his seizure or detention was only brief or temporary, it violated the Fourth Amendment because the officers did not have a reasonable, articulable suspicion that he had committed a crime. As we conclude upon the facts as found by the trial court that the defendant was never "seized" or "detained" in the constitutional sense at any time prior to being told he was under arrest, however, we find it unnecessary to address this question.

The trial court's findings of fact were supported by substantial evidence introduced during the hearing on the defendant's motion to suppress and, therefore, are binding upon this Court. *State v. Mahaley*, 332 N.C. 583, 423 S.E.2d 58 (1992). The trial court's conclusions of law based upon those facts, however, are fully reviewable on appeal. *Id.* Therefore, we turn to applicable principles of law in reviewing those conclusions.

It is well established that

[l]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. If there is no detention—no seizure within the mean-

ing of the Fourth Amendment—then no constitutional rights have been infringed.

*Florida v. Royer*, 460 U.S. at 497-98, 75 L. Ed. 2d at 236 (citations omitted). We conclude that the facts found by the trial court required its conclusion that the defendant Farmer was not "detained" or "seized" for Fourth Amendment purposes prior to being asked why he had lied about his identity. We further conclude that the facts found by the trial court compel the conclusion that the defendant was not "detained" or "seized" within the meaning of the Fourth Amendment until he was actually placed under arrest based on probable cause.

A person is "seized" for Fourth Amendment purposes

> only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." United States v Martinez-Fuerte, 428 US 543, 554, 49 L Ed 2d 1116, 96 S Ct 3074. As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

> . . . .

> [A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. See Terry v Ohio, *supra*, at 19, n 16, 20 L Ed 2d 889, 88, S Ct 1868, 44 Ohio Ops 2d 383; Dunaway v New York, 442 US 200, 207, and n 6, 60 L Ed 2d 824, 99 S Ct 2248; 3 W. LaFave, Search and Seizure 53-55

(1978). In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of the person.

*United States v. Mendenhall*, 446 U.S. at 553-55, 64 L. Ed. 2d at 509-10 (1980) (opinion of the Court by Stewart, J., joined by Rehnquist, J. (now C.J.), and joined in part by Burger, C.J., and Blackmun and Powell, JJ.).

On the facts found here by the trial court from substantial competent evidence, no "detention" or "seizure" of the defendant occurred in the present case prior to his being told that he was under arrest. *See id.* at 555, 64 L. Ed. 2d at 510. The defendant's encounter with the officers took place on a public street. The officers wore no uniforms and displayed no weapons. They did not summon the defendant into their presence, but instead approached him and identified themselves as law enforcement officers. They requested, but did not demand, information concerning the defendant's identity and place of residence and asked why he was covered with what appeared to be blood. They also asked him why he had given them a false name after it became apparent that he had done so. Such conduct, without more, was not an intrusion upon any constitutionally protected interest. *Id.* The defendant was not "seized," briefly or otherwise, in the constitutional sense simply by reason of the fact that the officers approached him and asked such questions. *Id.*

On the facts found by the trial court, we conclude that, prior to being told that he was under arrest, the defendant had no objective reason to believe that he was not free to end his encounter with the law enforcement officers and to proceed on his way. *Id.* Therefore, we conclude that, until he was formally placed under arrest, the defendant was not "detained" or "seized" within the meaning of the Fourth Amendment.

The defendant further contends under this assignment of error that he was seized in violation of Article I, section 20 of the Constitution of North Carolina and that physical evidence obtained as a result of that seizure must therefore be suppressed. "Our state constitution, like the Federal Constitution, requires the exclusion of evidence obtained by unreasonable search and seizure." *State v. Carter*, 322 N.C. 709, 712, 370 S.E.2d 553, 555 (1988). For reasons previously discussed herein concerning the applicability of the Fourth Amendment, we conclude that the defendant was

not "seized" within the meaning of the Constitution of North Carolina. *See generally State v. Bromfield*, 332 N.C. 24, 418 S.E.2d 491 (1992) (discussing controlling principles concerning seizure or involuntary detention within the meaning of our state constitution).

All of the physical evidence introduced at trial was .seized incident to the defendant's arrest or seized thereafter upon the authority of the search warrant issued after his arrest. To be lawful, the defendant's warrantless arrest must be supported by probable cause. *State v. Zuniga*, 312 N.C. 251, 259, 322 S.E.2d 140, 145 (1984). "A warrantless arrest is based upon probable cause if the facts and circumstances known to the arresting officer warrant a prudent man in believing that a felony has been committed and the person to be arrested is the felon." *Id.* (quoting *State v. Shore*, 285 N.C. 328, 335, 204 S.E.2d 682, 686 (1974) ). On the facts found by the trial court as previously set forth in this opinion, the officers clearly had probable cause for a warrantless arrest of the defendant at the time he was formally placed under arrest. The same information, submitted in the affidavit presented to the issuing magistrate, provided probable cause for the issuance of the search warrant. *State v. Arrington*, 311 N.C. 633, 319 S.E.2d 254 (1984). Therefore, the seizure of physical evidence pursuant to the arrest of the defendant and pursuant to the search warrant later issued was lawful.

For the foregoing reasons, the trial court did not err in denying the defendant's motion to suppress the physical evidence in question. This assignment of error is without merit.

[2]  In his next assignment of error, the defendant contends that the trial court erred by preventing him from cross-examining Michael Smith about the existence of a plan by the defendant to rape a woman in Stokesdale. On direct examination, Smith testified that the defendant had asked him to be a lookout while the defendant raped an elderly woman in Stokesdale. On cross-examination, the defendant attempted to minimize this testimony by showing that neither the defendant nor Smith was ever serious about the matter. However, when the defendant attempted to produce this evidence on cross, the trial court sustained the State's objection to some of the defendant's questions.

Assuming *arguendo* that the trial court erred in sustaining the objections to the defendant's questions, the error was harmless. A defendant is prejudiced by errors arising other than under the Constitution of the United States when there is a reasonable possibili-

ty that, had the error in question not been committed, a different result would have been reached at trial. N.C.G.S. § 15A-1443(a) (1988).

In the present case, the trial court sustained the State's objections to some of the defendant's questions regarding the seriousness of Smith and the defendant's plan to rape a woman in Stokesdale. However, the trial court also overruled some of the State's objections and allowed Smith to answer as evidenced by the following cross-examination:

Q. Michael [Smith], you did not have any plans to go out and rape anybody did you?

MR. GOODMAN: Objection.

COURT: Overruled.

A. No, sir.

Q. You did not have a plan to go and break into anybody's house?

A. No, sir.

Q. Was it your intention to break into anybody [sic] house?

A. No, sir.

COURT: Approach the Bench, counsel. (After consultation) Rephrase the question.

Q. Now Mr. Smith, you did not plan or intend in going along and being a look out for any crime that Daron Farmer may have told you about?

A. No, sir. Yes.

MR. GOODMAN: Objection.

COURT: Overruled.

Q. Sir?

A. Yes, sir.

Q. You were planning to go with Daron Farmer that night?

MR. GOODMAN: Objection, he answered that.

COURT: Overruled

A. Yes, sir.

Q. And you went down and waited for Daron to come and get you?

A. Yes, sir.

. . . .

Q. Now you did not think that you were going to rape anybody or break into a house if you went with Daron Farmer did you?

MR. GOODMAN: Objection.

A. Yes, sir.

COURT: Overruled.

Q. Did you think that you were going to rape somebody or be a look out?

A. No, sir.

The trial court did sustain the State's objections when the defendant asked Smith further questions, such as whether the defendant "was serious about" anything that was said during their conversations about going to rape anyone. However, the testimony Smith was allowed to give adequately permitted the defendant to introduce evidence as to whether Smith and the defendant were serious about any conversations they had concerning raping a woman in Stokesdale. Given the strength of the State's evidence against the defendant and the fact that the defendant was allowed to elicit testimony regarding the nature of his conversations with Smith about raping a woman in Stokesdale, we conclude that the trial court's decision to exclude similar testimony did not affect the outcome at trial. Therefore, the defendant has failed to carry his burden of showing a reasonable possibility that, but for the purported error in question, a different result would have been reached at trial. N.C.G.S. § 15A-1443(a) (1988). Accordingly, this assignment of error is without merit.

[3] In his next assignment of error, the defendant contends that the trial court erred by admitting evidence of Betty Shields' written statement to Officer Ronald Washburn as corroborative evidence. Specifically, the defendant argues that the written statement Shields gave to Washburn did not corroborate her trial testimony but was inconsistent with such testimony.

In order to be admissible as corroborative evidence, a witness's prior consistent statements merely must tend to add weight or credibility to the witness's testimony. *State v. Harrison*, 328 N.C. 678, 682-83, 403 S.E.2d 301, 304 (1991). Further, it is well established that such corroborative evidence may contain new or additional facts when it tends to strengthen and add credibility to the testimony which it corroborates. *State v. Burton*, 322 N.C. 447, 450, 368 S.E.2d 630, 632 (1988). However, the witness's prior contradictory statements may not be admitted under the guise of corroborating his testimony. *State v. Ramey*, 318 N.C. 457, 469, 349 S.E.2d 566, 574 (1986).

At some point after his arrest, the defendant called his mother-in-law, Betty Shields. Shields testified at trial that the defendant had told her that he and Timmie Tilley were walking past Robinson's house and that Tilley wanted to break into the home. Shields also testified that the defendant had told her that he was "going through the closet" while Tilley was beating Robinson.

On 21 October 1990, Betty Shields gave a written statement to Officer Ronald Washburn regarding these same conversations that she had with the defendant. Evidence of that statement was accepted as evidence tending to corroborate Shields' trial testimony. In her written statement, Shields stated that the defendant had told her that he and Tilley were walking past Robinson's home when the defendant suggested that they break into Robinson's house. Shields also stated that the defendant had told her that while Tilley and Robinson were arguing, the defendant opened the door which led into the hallway and "started ransacking the place."

The defendant argues that Shields' written statement to Washburn contradicted her trial testimony and was, therefore, inadmissible as corroborative evidence. Assuming *arguendo* that Shields' written statement contradicted her trial testimony and was not corroborative, we conclude that its admission into evidence was harmless. N.C.G.S. § 15A-1443(a) (1988).

Shields testified that the defendant had told her that he and Tilley had broken into and entered Robinson's house by pushing in a window. Shields further testified that the defendant had told her that he was "going through" the closet while his accomplice Tilley was beating Robinson to death. This testimony supported an inference of concerted action between the defendant and Tilley. Such evidence, if believed by the jury, would have required convic-

tion of the defendant on a theory of concerted action, regardless of who first suggested breaking into the home. In light of the evidence already before the jury in the form of Shields' testimony, as well as other evidence adduced at trial, we conclude that the defendant has not met his burden of showing a reasonable possibility that a different result would have been reached at the trial had Shields' pretrial written statement been excluded. *Id.* This assignment of error is also without merit.

[4] In his next assignment of error, the defendant contends that the trial court erred by refusing to give his requested special jury instruction regarding factors relevant to premeditation and deliberation. In addition to the pattern instruction on premeditation and deliberation, the defendant requested the following instruction:

> Further, the fact that there are multiple wounds and the brutal circumstances of the killing are facts from which the jury could infer premeditation and deliberation. However, these facts, standing alone, are not sufficient for the jury to find premeditation and deliberation. You must look at all the facts and circumstances surrounding the killing and consider them jointly in making a decision. You must also consider what the defendant did prior to the killing and whether that conduct shows that he engaged in activity directed toward the killing. The mere fact that a killing was attended by much violence or that severe wounds were inflicted is not, in and of itself, determinative, as such a killing is as likely to have been on impulse.

The trial court denied the defendant's request and gave the following pattern instruction on premeditation and deliberation:

> Now, neither premeditation nor deliberation is usually susceptible of direct proof. They may be proved by proof of circumstances from which they may be inferred, such as the lack of provocation by the victim; the conduct of the defendant before, during and after the killing; threats and declarations of the defendant; use of grossly excessive force; infliction of lethal wounds after the victim is felled; brutal or vicious circumstances of the killing; and the manner in which or the means by which the killing was done.

N.C.P.I. Crim. 206.10 (1989).

STATE v. FARMER

[333 N.C. 172 (1993)]

It is well established that if a request is made for a jury instruction which is correct in itself and supported by evidence, the trial court must give the instruction at least in substance. *State v. Lamb*, 321 N.C. 633, 644, 365 S.E.2d 600, 606 (1988); *State v. Hooker*, 243 N.C. 429, 431, 90 S.E.2d 690, 691 (1956). The trial court gave the jury the pattern instruction stating in part that premeditation and deliberation are not usually susceptible of direct proof and may be proved by circumstances such as the use of grossly excessive force and the brutal circumstances of the killing. The defendant argues that the pattern instruction did not include his requested instruction, even in substance, because it did not instruct the jury that the mere existence of grossly excessive force or brutal circumstances would not, standing alone, be sufficient to support a finding of premeditation, as those factors are as likely to exist in an unpremeditated killing as in a premeditated and deliberate murder. To support this argument, the defendant relies upon cases such as *Alston v. United States*, 382 F.2d 129, 139 (D.C. Cir. 1967), which stated that

> [v]iolence and multiple wounds . . . cannot standing alone support an inference of . . . premeditation and deliberation, as contrasted with an impulsive and senseless, albeit sustained, frenzy.

We find it unnecessary to address or resolve the issue raised by the defendant in this assignment. In the present case, the jury returned a verdict expressly finding the defendant guilty of first-degree murder *both* under the felony murder theory *and* under the theory that the murder was committed with premeditation and deliberation. That being the case, it would not have been reversible error for the trial court to have failed to give any instructions concerning premeditation and deliberation. *See State v. Wall*, 304 N.C. 609, 620-21, 286 S.E.2d 68, 75 (1982). Therefore, even if the trial court erred in failing to give the defendant's requested special instruction, no prejudice resulted from the trial court's omission in this regard.

For the foregoing reasons, we conclude that the defendant received a fair trial free of prejudicial error.

No error.