McCULLOUGH, Judge.
Defendant was tried before a jury at the 30 April 2003 Criminal Session of Buncombe County Superior Court after being charged with first degree burglary, felony larceny, and as an habitual felon. At trial, the State's evidence tended to show the following: On the evening of 15 October 2002, Ms. Bridget Morrow (Ms. Morrow), and her friend Allison Cross (Allison), helped defendant get into Hector Alexander Sanchez Perez's (Mr. Perez's) house to steal his money. Mr. Perez was home alone when Ms. Morrow first arrived at his house to borrow gas money. The money was in fact to be used to purchase more drugs, which Ms. Morrow and friends had been using that day. She followed Mr. Perez to hisbedroom where he had a large sum of money in a drawer. There was $5,102.00 alleged to be in the drawer at the time, money which Mr. Perez had just withdrawn from the bank to use to pay a fee to have a friend brought to the United States from El Salvador. In addition to the cash, Mr. Perez had three checks, each for $292.86, payable to "Hector Sanchez." After Mr. Perez gave Ms. Morrow $20.00 for gas, Ms. Morrow told him she would be back because she needed to stay at his place for the night. After leaving, she returned to where Allison and defendant had been waiting in a truck outside Mr. Perez's home. The three then used the money to purchase crack cocaine.
In the desire to get more crack, the defendant came up with a plan to steal the rest of Mr. Perez's money. Approximately twenty minutes after Ms. Morrow had first left Mr. Perez's home, the three returned and parked the truck down the street. Ms. Morrow and Allison entered the house while defendant remained outside. While inside, Allison asked for a glass of water and Ms. Morrow asked to use the restroom towards the back of the home. While Mr. Perez was distracted, Ms. Morrow unlocked the backdoor of the home so that defendant could gain entry while Mr. Perez was still in the living room. After she finished using the restroom, Ms. Morrow returned to the living room where Mr. Perez and Allison were on the couch. Mr. Perez was on the telephone when he heard a loud noise and ran to his bedroom to discover his money was gone. At trial, Mr. Perez testified through an interpreter that he saw a man running out of the backdoor, but could not determine the race of the man. Ms.Morrow testified that she saw defendant running out the backdoor carrying the money.
Mr. Perez immediately telephoned the police. Allison ran away, but Mr. Perez was able to detain Ms. Morrow until the police arrived. Deputy Knight with the Buncombe County Sheriff's Department arrived and completed an incident report. The case was assigned to Detective Baird from the same department, who questioned Ms. Morrow while Deputy Knight continued to speak with Mr. Perez. At first Ms. Morrow was evasive, but she began to answer questions directly to Detective Baird after he told her she may be held accountable for the burglary. Ms. Morrow identified Allison and defendant, and told Detective Baird that they had been driving around in a large black Ford truck. Ms. Morrow provided a description of her friends and that either might be driving.
Ms. Morrow then agreed to ride around with Detective Baird to try and locate the truck. Approximately 45 minutes after the alleged incident, Detective Baird and Ms. Morrow spotted a large black Ford F-150 approximately 3 miles from Mr. Perez's residence. The truck was occupied by a black male and was parked in a public housing project, an area known for its high concentration of drug-related crimes. Ms. Morrow told the Detective that she did not think this was the truck because it had an emblem on the back window that she did not recognize. After driving around some more, when Detective Baird again saw the same dark Ford F-150 driven by a black male, he decided to initiate a stop. Officer Calloway, a patrolman that had been put on alert, assisted in the stop. Upon the stop, defendant exited the truck. It was dark and began raining hard. With Detective Baird looking on, Officer Calloway frisked the defendant for safety. Detective Baird observed Officer Calloway hit defendant's pockets and heard him say, "There's something in there." Officer Calloway removed what felt like a two inch bulge from defendant's front pocket. It was a bundle of dollar bills rolled up tightly with a check that was made out to "Hector Sanchez" in the amount of $292.86. At trial, defendant sought to suppress this evidence on the theory that the stop and frisk were unlawful. The court denied this motion.
When the money and the check were found, and prior to a rights advisement, Detective Baird asked defendant where the money came from. Defendant stated that Allison and Ms. Morrow were the ones who set up the whole thing and that he remained in the truck while they went inside. During the trial, defendant sought to suppress the evidence of the statements made by defendant after the money was discovered. The trial court found that defendant was in custody from the time of the frisk, and therefore granted the motion. The jury was instructed to disregard any statements made by defendant to Detective Baird. Defendant did not request a mistrial.
During the second phase of the trial, on the habitual felon indictment, the State offered evidence of each of defendant's three prior felony convictions. Defendant made no objections to the State's exhibits evidencing these felony convictions, but made a motion to dismiss the indictment because the habitual felonindictment had the wrong date of conviction for one of the underlying felonies. Instead of the conviction date, 25 July 2000, the habitual indictment had the date defendant's probation for that conviction was revoked, 31 October 2000. However, the date of the underlying offense was correctly reflected in the habitual indictment, 13 May 2000. Before the trial began, the State's motion to have the indictment corrected was granted.
Defendant offered no evidence at either stage of the trial. For the underlying charges, the jury returned verdicts of guilty of first-degree burglary and misdemeanor larceny. For the habitual charge, the jury returned a verdict of guilty. Defendant was found to have eight criminal history points and was sentenced, in category III, within the presumptive sentence range to a term of imprisonment a minimum of 116 months and maximum 149 months.
Defendant now raises five issues on appeal: (I) that it was error to admit the out-of-court statement of Mr. Perez, under the theory it was offered for corroboration of his testimony, which identified the assailant's race; (II) & (III) that it was error to allow evidence discovered as a result of an illegal stop, and/or an illegal frisk; (IV) that it was error for the court to allow the State to correct its habitual felon indictment to reflect the proper date of one of defendant's prior convictions; and (V) that defense counsel was ineffective in failing to move for a mistrial after defendant's statements prior to his Miranda warning were heard by the jury. We now address these issues in turn, finding the trial was free from reversible error.
I. Out-of-Court Statement Offered to Corroborate
Defendant contends that Mr. Perez's pretrial statement that he saw a "black guy" running out of his backdoor, is inconsistent with his in-court testimony that he could not identify the race of the individual he saw running out of his backdoor. Defendant argues this pretrial statement cannot be offered for the limited purpose of corroborating defendant's in-court statement and that it was prejudicial error in allowing the jury to hear it. The State concedes the court did err in allowing the pretrial statement, but submits that it was harmless. We agree with the State.
It is well established that a witness's prior statements may be admitted to corroborate the witness's sworn trial testimony, but they may not be used as substantive evidence. State v. Harrison, 328 N.C. 678, 681, 403 S.E.2d 301, 303-04 (1991). "In order to be corroborative and therefore properly admissible, the prior statement of the witness need not merely relate to specific facts brought out in the witness's testimony at trial, so long as the prior statement in fact tends to add weight or credibility to such testimony." State v. Ramey, 318 N.C. 457, 469, 349 S.E.2d 566, 573 (1986). See also State v. Mickey, 347 N.C. 508, 519, 495 S.E.2d 669, 676 (1997), cert. denied, 525 U.S. 853, 142 L. Ed. 2d 106 (1998). However, prior statements that indicate additional or new information that is not referred to in the witness's trial testimony, may never be admitted as corroborative evidence. Ramey, 318 N.C. at 469, 349 S.E.2d at 574. Additionally, the witness'sprior contradictory statements may not be admitted under the guise of corroborating his testimony. Id.
Our Supreme Court has previously applied the harmless error standard under N.C. Gen. Stat. § 15A-1443(a) (2003) to determine whether an erroneous admission of a prior statement for purposes of corroboration entitled defendant to a new trial. In State v. Farmer, 333 N.C. 172, 424 S.E.2d 120 (1993), the Court found the evidence was sufficient, if believed by the jury, to support a conviction of first-degree murder, concluding that "the defendant has not met his burden of showing a reasonable possibility that a different result would have been reached at the trial had [the witness'] pretrial written statement been excluded." Id. at 193, 424 S.E.2d at 132. In the case of State v. Sidberry, 337 N.C. 779, 448 S.E.2d 798 (1994), the Court stated that where the witness' "pretrial statement contained significant discrepancies from his testimony at trial and should not have been admitted as corroborative evidence[,]" the error was harmless because of other substantial evidence of defendant's guilt presented at trial. Id. at 784, 448 S.E.2d at 802.
In the instant case, the only discrepancy between the pretrial statement and in-court statements made by Mr. Perez, is whether he saw the race of defendant. However, this same evidence was elicited in the direct testimony of Ms. Morrow, who stated:
A: ...And, first, I saw [defendant] run out the door, I guess, holding the money ....
Q: From where you were, were you able to actually see the Defendant come out of [Mr. Perez's] room?
A: Yes.
****
Q: Were you able to tell exactly what he was holding or was he just-
A: Well, I could kind of tell what it was because there was dollars flying everywhere on the-on the ground.
Defendant was sitting in front of the jury at the time this testimony was given, with his race clearly apparent. Evidence also shows that Ms. Morrow informed the police of the assailant's race on the night of the incident. In light of this direct, and uncontested evidence, we conclude that defendant has failed to show a reasonable possibility that, had the error not occurred, a different result would have been reached at trial.
This assignment of error is overruled.
II. & III. Lawful Investigatory Stop and Lawful Frisk
Next, defendant contests the trial court's denial of his motion to suppress evidence, based on Fourth Amendment grounds, that was procured from a warrantless stop and subsequent frisk. Specifically, defendant claims that Detective Baird lacked reasonable articulable suspicion of criminal activity to temporarily stop the truck suspected to have fled the incident; and that Detective Baird lacked a reasonable articulable suspicion that defendant was armed and dangerous to justify a frisk. Because theguarantees of the Fourth Amendment were not implicated in this case, we do not agree.
Our review of a trial court's denial of a motion to suppress is strictly "`limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law.'" State v. Barden, 356 N.C. 316, 340, 572 S.E.2d 108, 125 (2002)(quoting State v. Cooke, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982)) cert. denied, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003). Here, defendant does not dispute that the trial court's findings of fact are sufficiently supported by competent evidence. Rather, he contends the findings do not support the trial court's conclusion that Detective Baird had a reasonable suspicion of criminal activity thereby justifying a stop and frisk of defendant.
The court's findings on the motion to suppress, based on the legality of the stop and frisk, were as follows:
[1.] That on the evening in question the - the investigating officer had obtained a statement from a co - what amounted to a co-Defendant in this case by what had occurred in Mr. Perez' apartment with regard to the larceny or robbery of some money from there; and that this officer and others were told that the - that there was a - that the ones involved in this along with her were likely in a large Ford truck, possibly an F-150, either being operated by a young woman or a black male or occupied by both.
[2.] And approximately 45 minutes after that it was relayed to the officers and somethree miles from there in another area of public housing, the officers found the truck being occupied by a black male and detained it on that basis, got the occupant out and began to frisk him; found a bulge in his pockets, ascertained that that might be a weapon or [sic] some sort, and then determined - in light of the safety of the officers, extracted that object from the pocket of the man being detained, who happened to be the Defendant in this case, and found that to be a roll of money in excess of some $200 together with a check that was the check of Mr. Perez paid to him by his employer for services rendered.
[3.] Based upon that the Court concludes that it was - the Court concludes that the search was reasonable under the totality of the circumstances, that the Defendant's expectation of privacy was limited in that he was driving somebody else's truck.
[4.] And, furthermore, that the officers had a reasonable anticipation that an object, such as what they were confronted with, could, in the interest of officer safety, be something that needed to be inquired about and ascertain the existence of.
[5.] And based upon that, the Court concludes that such search was reasonable under the circumstances and not Constitutionally prohibited ....
We now apply these findings and the underlying evidence to the applicable law.
A. The Stop
In North Carolina, "[w]hen an officer observes conduct which leads him reasonably to believe that criminal conduct may be afoot, he may stop the suspicious person to make reasonable inquiries." State v. Pearson, 348 N.C. 272, 275, 498 S.E.2d 599, 600 (1998). Based on the totality of the circumstances, "`[t]he police officer must be able to point to specific and articulable facts, whichtaken together with rational inferences from those facts, reasonably warrant [the] intrusion.'" State v. Thompson, 296 N.C. 703, 706, 252 S.E.2d 776, 779 (quoting Terry v. Ohio, 392 U.S. 1, 21, 20 L. Ed. 2d 889, 906 (1968)), cert. denied, 444 U.S. 907, 62 L. Ed. 2d 143 (1979). These specific and articulable facts must provide only a minimum level of justification when viewed through the eyes of a reasonable, cautious officer, guided by his experience and training. State v. Watkins, 337 N.C. 437, 441-42, 446 S.E.2d 67, 70 (1994).
In the case at bar, we believe the trial court's findings and the underlying evidence of the totality of the circumstances support Detective Baird's stop. The stop at issue took place three miles from the burglary and in an area known for its high rate of drug crimes. At the time of the stop, Detective Baird was looking for a large Ford truck driven by a white female or a black male based on the description given by defendant's alleged co-conspirator, Ms. Morrow. Detective Baird knew that the driver of the truck had been using crack cocaine earlier that day, and had been planning on buying more later that night. Detective Baird first saw a truck matching the description of Ms. Morrow's, but when he asked her if she thought that was the truck, she said no because she did not recognize an emblem on the truck's rear window. Detective Baird checked with other officers in the area to see if they had seen another black Ford F-150 since the burglary, and they had not. Upon passing the truck for a second time, Detective Baird, in light of his eight years of experience, knowledge of thehousing project area, proximity to the crime scene, description of the vehicle and defendant as a black male, and that no other truck had been reported in the area by the other patrolling officers, decided to conduct a stop. Under the totality of these circumstances, Detective Baird had ample justification for the temporary stop.
B. The Frisk
The Fourth Amendment allows reasonable searches and seizures based upon probable cause. In Terry, 392 U.S. 1, 20 L. Ed. 2d 889, the Supreme Court made clear delineations between a "frisk" and a "search." State v. Harris, 95 N.C. App. 691, 696, 384 S.E.2d 50, 52-53 (1989), aff'd, 326 N.C. 588, 391 S.E.2d 187 (1990). In Terry, the Court created a narrow exception to the probable cause requirement for a search which allows a law enforcement officer, for his own protection and safety, to conduct a frisk to find weapons he reasonably believes or suspects are then in the possession of the person he stopped. Id. The officer conducting the search must be able to articulate specific facts, which combined with rational inferences therefrom, reasonably warrant the intrusion. Terry, 392 U.S. at 27, 20 L. Ed. 2d at 909.
The Terry exception was based upon police necessity to act quickly to insure that the person stopped is not armed with a weapon that would be used against the police or others in close proximity. Harris, 95 N.C. App. at 696, 384 S.E.2d at 52-53. The scope of this exception confines itself to an intrusion reasonably designed to discover weapons or other items that could be used as weapons. Terry, 392 U.S. at 30, 20 L. Ed. 2d at 911. The Court justified this by stating, "it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." Id. at 28, 20 L. Ed. 2d at 908. In North Carolina, the courts have followed these principles closely, and have found that it is well within the law to conduct a frisk of a defendant for weapons when it is strictly limited to the determination of whether that defendant was armed. See State v. Long, 37 N.C. App. 662, 668, 246 S.E.2d 846, 851, disc. review denied and appeal dismissed, 295 N.C. 736, 248 S.E.2d 866 (1978) (A sharp pointed object which was thought to be a knife was pulled out of defendant's boot and the object was found to be a spoon wrapped in plastic with eight small packets of a powder-type substance, three white Q-tips, and one needle); Sibron v. New York, 392 U.S. 40, 20 L. Ed. 2d 917 (1968) (Where a frisk is based solely on a reasonable suspicion the defendant possesses drugs, it is unconstitutional.). It is the officer's subjective intention when frisking a person, not what the frisk produces, which determines the legality of the frisk.
In the case at bar, we believe the trial court's findings and the underlying evidence of the totality of the circumstances support a reasonable articulable suspicion that defendant was armed and dangerous to justify a frisk. Defendant was stopped during the evening or nighttime hours, in heavy rain, and in an area with a high concentration of drug crimes. Defendant was alleged to havebeen using crack cocaine earlier that day, to have burglarized a house from which he took approximately $5,000 for the purchase of more drugs, and to have fled the scene of the crime. See, e.g., Harris, 95 N.C. App. at 696-98, 384 S.E.2d at 52-53 (where there was evidence that, through the arresting officers' experience, a weapon was found in 85% of drug-related arrests). Upon the lawful stop, Officer Calloway, having constructive knowledge of the circumstances from Detective Baird's communications, had reasonable suspicion that defendant may be armed and dangerous and he should conduct a frisk. Furthermore, Detective Baird witnessed Officer Calloway feel the two-inch bulge in the defendant's pants, and state, "there is something in his pocket." Detective Baird testified that he saw the two-inch bulge and that it could have been a threat to officer safety. He testified that, "[t]here was a possibility, we thought, because of in a sense we didn't know what we had, if we had a robbery.... And so for officer safety, that was the initial thing." The object in defendant's pants could not be immediately disregarded as something harmless, and was removed to neutralize the potential threat. Based on these reasonable and articulable facts, we believe the frisk was lawful, as was the removal of a potential threat.
Therefore, we hold both the stop and the subsequent frisk of defendant were not conducted in violation of defendant's Fourth Amendment rights. Applying the principles of Terry as adopted by the North Carolina courts, we believe the trial court had before it sufficient evidence to correctly deny defendant's motion to suppress the evidence reaped from the stop and frisk of defendant. These assignments of error are overruled.
IV. Correction of Date on Habitual Felon Indictment
Next, defendant asserts that it was error for the trial court to allow the State, over defense's objection, to correct a date of one of defendant's prior felony convictions on the habitual felon indictment. We do not agree.
Generally, a bill of indictment may not be amended. N.C. Gen. Stat. § 15A-923(e) (2003). However, this statute has been construed to mean that an indictment may not be amended in a way which would substantially alter the charge set forth in the indictment. State v. Sisk, 123 N.C. App. 361, 366, 473 S.E.2d 348, 352 (1996), aff'd in part and disc. review improvidently allowed in part, 345 N.C. 749, 483 S.E.2d 440 (1997). In the context of dates on an habitual felon indictment as to prior convictions, we have held that "it was the fact that another felony was committed, not its specific date, which was the essential question in the habitual felon indictment." State v. Locklear, 117 N.C. App. 255, 260, 450 S.E.2d 516, 519 (1994). Therefore, such changes do not substantially alter or change the habitual charge set forth. See State v. Hargett, 148 N.C. App. 688, 693, 559 S.E.2d 282, 286, disc. review improvidently allowed, 356 N.C. 423, 571 S.E.2d 583 (2002).
In the case at bar, the incorrect date of the prior conviction was the date of the probation violation judgment stemming from the prior conviction, and stating the same date of the offense. This gave defendant clear notice as to which conviction the State was referring to in their habitual felon indictment. Therefore, thecourt did not err in allowing a correction to list the proper date of conviction.
This assignment of error is overruled.
V. Ineffective Assistance of Counsel
Lastly, defendant argues he received ineffective assistance by his defense counsel. Defendant's claim is based on his counsel's failure to motion for a mistrial after the jury heard incriminating statements made by defendant in violation of the United States Constitution's Fifth and Sixth Amendment rights to an attorney (before his Miranda rights were read). See Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, reh'g denied, California v. Stewart, 385 U.S. 890, 17 L. Ed. 2d 121 (1966). We do not agree.
We begin by noting that ineffective assistance of counsel claims are usually raised in post-conviction proceedings and not on direct appeal. Such claims may, however, be raised on direct appeal when the cold record reveals that no further factual development is necessary to resolve the issue. State v. Fair, 354 N.C. 131, 166, 557 S.E.2d 500, 524 (2001), cert. denied, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002). In the case at bar, we find no further factual development is necessary to review defendant's claim.
We have long applied the following two-part test to a defendant's claim of ineffective assistance of counsel:
"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced thedefense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."
State v. Braswell, 312 N.C. 553, 562, 324 S.E.2d 241, 248 (1985) (quoting Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, reh'g denied, 467 U.S. 1267, 82 L. Ed. 2d (1984)). Applying this two-part test, our Supreme Court has held: "A stringent standard of proof is required to substantiate ineffective assistance claims. In fact . . . relief based upon such claims should be granted only when counsel's assistance is `so lacking that the trial becomes a farce and mockery of justice.'" State v. Montford, 137 N.C. App. 495, 502, 529 S.E.2d 247, 252, cert. denied, 353 N.C. 275, 546 S.E.2d 386 (2000) (quoting State v. Pennell, 54 N.C. App. 252, 261, 283 S.E.2d 397, 403 (1981), disc. review denied, 304 N.C. 732, 288 S.E.2d 804 (1982) (citations omitted)).
In the case at bar, Detective Baird testified that after the frisk of defendant, defendant said that Ms. Morrow and Allison set up the whole thing. The defense counsel objected to this statement, and requested a hearing on whether defendant was in custody at the time it was made. After a voir dire hearing, the court sustained the objection and granted the defense counsel's motion that the statement be stricken. The court instructed the jury not to consider the statement. Defense counsel did not move for a mistrial.
We need not consider the first test of Braswell, as we find no reasonable possibility that but for defense counsel's alleged erroranother verdict would have been reached. Moreover, even had counsel moved for a mistrial, such a motion must be granted by the court only if defense counsel shows that the error "resulted in substantial and irreparable prejudice to the defendant's case." N.C. Gen. Stat. § 15A-1061 (2003). We cannot say that the jury's hearing of defendant's statement caused substantial and irreparable prejudice to defendant's case. The jury had before it the following evidence: defendant was seen running out of Mr. Perez's home with loose money trailing him; he was discovered with a wad of money that included in it a check payable to Mr. Perez; and one of his alleged co-conspirators testified that he took part in planning the burglary of Mr. Perez's home to obtain more money to continue to purchase crack cocaine for its immediate consumption. See State v. Ramirez, 156 N.C. App. 249, 254-55, 576 S.E.2d 714, 718-19, disc. review denied, 357 N.C. 255, 583 S.E.2d 286, cert. denied, ___ U.S. ___, 157 L. Ed. 2d 388 (2003) (where we stated there was no ineffective assistance of counsel for failing to move for a mistrial when, under the court's standard for granting a mistrial, there could be no irreparable or substantial prejudice because of the ample incriminating evidence that was properly before the jury). Additionally, we note that we believe defense counsel was sufficient when making a timely objection to the illegally elicited evidence, seeking a voir dire hearing on the issue of custody, having the statement stricken, and receiving a favorable jury instruction.
This assignment of error is overruled. Upon careful review of the record, transcript, and the arguments presented by the parties, we conclude defendant received a fair trial, free from reversible error.
No error.
Judges McGEE and ELMORE concur.
Report per Rule 30(e).